IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| MICHAEL CARR; GREGORY KATHAN; KELLY L'ROY; PERRY MEIER; CHARLES MULHALL; and SCOTT MUND, on behalf of themselves and all others similarly situated, <br>      Plaintiffs <br><br> v. <br><br> AIR LINE PILOTS ASSOCIATION, INTERNATIONAL <br>      Defendant. | CIVIL ACTION NO. _____ <br><br><br> JURY TRIAL DEMANDED |

## PLAINTIFFS' ORIGINAL COMPLAINT

### INTRODUCTION

1. When Continental Airlines ("Continental") merged with United Airlines ("United"), the Air Line Pilots Association, International ("ALPA") represented the pilots at both airlines. As part of the merger, ALPA was tasked with meshing the airlines' pilot seniority lists. For pilots, seniority controls pay, rank, schedule, flight routes, and even the type of aircraft flown. The most junior pilots are also the first to lose jobs during recessions. As a result, combining seniority lists is a process fraught with conflicts of interest. Nonetheless, ALPA routinely insists on acting as the dual agent for pilots on both sides of such disputes, as it did here.

2. To merge the Continental and United seniority lists, ALPA sponsored arbitration. Instead of honoring its duties to both pilot groups and remaining neutral, however, ALPA tilted the playing field to assure a combined seniority list that radically favors pre-merger United pilots at the expense of former Continental pilots. ALPA did so for political expediency.

3. The pre-merger United pilots have more votes in the post-merger union. If those pilots had been unhappy with the combined seniority list, they would control enough votes to decertify ALPA as the collective bargaining agent for post-merger United, costing ALPA 25 percent of its members and $28.6 million in annual dues. Because ALPA knew that the less numerous Continental pilots would have no political clout within the post-merger union, ALPA shirked its duties to those pilots and made certain to deliver a combined seniority list that would satisfy the more powerful union faction.

4. By breaching its duty to fairly represent the former Continental pilots, ALPA poisoned the seniority-list integration process, requiring the Court to vacate ALPA's politically expedient seniority list and to order that the process start over again.

## JURISDICTION AND VENUE

5. This Court has personal jurisdiction over ALPA. ALPA owes fiduciary duties to and is an agent for numerous former Continental pilots who live in Texas, including four of the class representatives. The performance of those duties was to take place, at least in part, in Texas. In addition, ALPA maintains an office at 3808A World Houston Parkway in Houston as its headquarters for dealing with union matters pertinent to post-merger United pilots. Accordingly, ALPA has purposefully availed itself of the benefits of conducting activities in Texas, and this dispute arises out of or has a substantial connection with ALPA's contacts with Texas. Therefore, ALPA has the requisite minimum contacts with Texas to allow this Court to establish personal jurisdiction. ALPA is further subject to general jurisdiction in Texas because it maintains two permanent offices here.

6. This court has subject-matter jurisdiction to entertain this claim for breach of the duty of fair representation because the claim arises under federal law, namely the Railway Labor

Act, 45 U.S.C. §§ 151, *et seq*., and the associated cause of action recognized in *Steele v. Louisville & Nashville Railroad Co.*, 323 U.S. 192 (1944), and its progeny.

7. This court is a proper venue under 28 U.S.C. § 1391 because ALPA does business in this district, represents hundreds of pilots based at the George Bush Intercontinental Airport, maintains a permanent office in this district, and is subject to personal jurisdiction in this district, making it a resident pursuant to 28 U.S.C. § 1391(c)(2). Houston is still the largest pilot base for post-merger United. Moreover, many class members reside in this district, a substantial part of the events or omissions giving rise to the claim occurred in this district, and the duties that ALPA breached were owed to hundreds of former Continental pilots based at George Bush Intercontinental Airport in Houston.

## PARTIES

8. Plaintiff Michael Carr is now a United pilot, was a Continental pilot, and was represented by ALPA at all relevant times. He is a citizen of Magnolia, Texas.

9. Plaintiff Gregory Kathan is now a United pilot, was a Continental pilot, and was represented by ALPA at all relevant times. He is a citizen of Colorado Springs, Colorado.

10. Plaintiff Kelly L'Roy is now a United pilot, was a Continental pilot, and was represented by ALPA at all relevant times. He is a citizen of Plano, Texas.

11. Plaintiff Perry Meier is now a United pilot, was a Continental pilot, and was represented by ALPA at all relevant times. He is a citizen of Conroe, Texas.

12. Plaintiff Charles Mulhall is now a United pilot, was a Continental pilot, and was represented by ALPA at all relevant times. He is a citizen of Houston, Texas.

13. Plaintiff Scott Mund is now a United pilot, was a Continental pilot, and was represented by ALPA at all relevant times. He is a citizen of Indio, California.

14. Defendant ALPA is a labor union that conducts business nationwide, including in the Southern District of Texas. ALPA may be served with summons through its registered agent for service of process or through its officers, including President Lee Moak, at 1625 Massachusetts Avenue Northwest, Washington, DC 20036, or wherever they may be found.

## CLASS ACTION ALLEGATIONS

15. Plaintiffs sue individually and as representatives of a class pursuant to Federal Rule of Civil Procedure 23(b)(1) or (b)(2). The class is defined as all persons (1) named in the Integrated Seniority List (the "List") prepared by ALPA's Seniority Integration Arbitration Board in connection with the September 3, 2013 Opinion and Award in the Matter of the Seniority Integration Arbitration Between the Pilots of Continental Airlines and the Pilots of United Air Lines, and (2) whose name appears on the List alongside the designation "CAL" in the Line" column of the List.

16. The class consists of approximately 4,600 former Continental pilots, making the class sufficiently numerous that joinder of all members is impractical.

17. ALPA's actions affected all class members, creating questions of law and fact common to the entire class. For example, the fact issues concerning ALPA's interference with the seniority-list combination are common to all class members, who were equally affected by those actions. Likewise, the fundamental legal question of whether ALPA breached its duty of fair representation is common to all class members.

18. The individually named Plaintiffs have the same interests and have suffered the same injuries shared by all class members. The claims of the individually named plaintiffs are typical of, and do not conflict with, the claims of other class members.

19. The class representatives have the same interest in pursuing this action as the members of the class and will fairly and adequately protect the interests of the class. The class representatives are drawn from many strata of the combined seniority list that ALPA manufactured, and Plaintiffs have retained qualified counsel experienced in class-action, aviation, and employment practice to represent them in this matter.

20. Prosecuting separate actions would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for ALPA, post-merger United, and the class members. Moreover, decisions with respect to individual class members would, as a practical matter, be dispositive of the interests of the other members not parties to the individual suits.

21. All claims arise from the same events following the United-Continental merger. Plaintiffs are seeking seniority integration rights that were wrongfully denied to members of the class. Consequently, ALPA has acted and refused to act on grounds that apply generally to the class, meaning that injunctive and declaratory relief are appropriate with respect to the entire Class.

## FACTUAL BACKGROUND

### Continental merges with United, resulting in a single collective-bargaining unit

22. Between 2000 and 2010, Continental reaped about $1 billion in profits, while United lost $7.8 billion. On October 1, 2010, Continental and United merged, with United as the surviving brand. As of that date, United had 7,699 pilots, and Continental had 4,638 pilots. For the most part, nearly all of these roughly 12,300 pilots now work for post-merger United.

23. ALPA is the largest pilot union in the world and represents nearly 50,000 pilots. ALPA is structured as a unitary union with no locals. Instead, pilots at each ALPA-represented airline elect a Master Executive Council ("MEC") to carry out union business at that airline.

24. Before the United-Continental Merger, ALPA represented pilots at both airlines; Continental pilots had one MEC, and United pilots had another. After the merger, Continental and United became a "single carrier," meaning that pilots of the combined airline now form a single collective-bargaining unit under the Railway Labor Act. Consequently, ALPA also consolidated the MECs for the two pilot groups into a single MEC that represents the pre-merger United pilots and the former Continental pilots who now work for United.

25. In the new, combined bargaining unit and MEC for post-merger United, the original United pilots control nearly two thirds of the votes. As a result, the original United pilots have sufficent votes to decide (a) which union will represent all 12,300 pilots in post-merger United and, within ALPA, (b) which pilots will serve on the MEC for post-merger United.

### ALPA sacrifices member interests to pursue international monopoly

26. In 2000, ALPA directors approved a "Unity Resolution," openly proclaiming ALPA's aspiration to assume monopoly status as the only union available for pilots in North America. The Unity Resolution expresses ALPA's "objective to provide representation for all members of the airline piloting profession in the United States and Canada," and instructs ALPA's president to "actively pursue fulfillment of this goal." To this day, ALPA professes "loyal[ty] to ALPA's Unity Resolution" as part of its strategic vision.

27. After 14 years of machinations to drive other pilots' unions out of business, ALPA has actually suffered devastating membership losses. The worst blow came in 2005, after U.S. Airways merged with America West Airlines. ALPA's handling of that merger explains much about the reasons why ALPA later skewed the seniority-list integration following the United-Continental merger in favor of United pilots.

28. As in this case, ALPA represented pilots on both sides of the U.S. Airways-America West merger. Also as in this case, the U.S. Airways and America West pilots participated in ALPA-sponsored arbitration to decide how to combine their seniority lists. The arbitrators created a list favorable to America West pilots.

29. Because America West was a smaller airline with fewer pilots, the former America West pilots became a minority within the new, consolidated bargaining unit for post-merger U.S. Airways. The original U.S. Airways pilots far outnumbered their America West colleagues and thus had enough votes to decide which union would represent the post-merger bargaining unit. And they voted en masse to decertify ALPA, expressly citing the seniority-list integration as their reason. The 5,400 pilots of post-merger U.S. Airways formed their own union, causing ALPA to lose 10 percent of its members.

30. Against this background, ALPA decided to learn from its "mistake" of allowing the smaller group of America West pilots to leapfrog the more numerous U.S. Airways pilots on the combined seniority list. The merger of U.S. Airways and America West taught ALPA that, when ALPA represents pilots on both sides of a merger, it must skew the combined seniority list in favor of pilots from the larger carrier to avoid losing the entire, post-merger collective bargaining unit to an independent union.

31. The lengths to which ALPA will go in pursuit of monopoly status are well documented. In 2001, ALPA represented TWA pilots when TWA merged with American Airlines, whose pilots were represented by a different union. After that merger, the more numerous American pilots would control sufficient votes to decide which union represented the post-merger airline. During the merger, ALPA's duty was to negotiate a combined seniority list favorable to its own members, the TWA pilots. Instead, ALPA took a dive during negotiations

in the hopes of currying enough favor with American pilots that they would vote to certify ALPA as the union for post-merger American Airlines.

32. In 2011, jurors concluded that ALPA breached its duty of fair representation to the TWA pilots during the seniority-list negotiations. In January 2014, ALPA paid $53 million to settle that case rather than proceeding to a second trial on damages. ALPA's actions toward the Continental pilots in this case were every bit as improper as the steps that ALPA took toward the TWA pilots who recovered $53 million in light of ALPA's misdeeds.

<b>ALPA creates seniority-list integration policy rife with opportunities<br>for union leaders to skew the results in favor of ALPA's internal political goals</b>

33. In the aftermath of the U.S. Airways' pilots blow to its monopolization goals, ALPA acted quickly to assure that it would never again lose members by allowing its arbitrators to create a seniority list that would irk members of the majority faction in a post-merger airline. Just one year after U.S. Airways pilots formed their own union, ALPA's executive board adopted wholesale changes to ALPA's Merger and Fragmentation Policy (the "Merger Policy"), which governs seniority-list combinations when ALPA represents pilots on both sides of the bargaining table.

34. Under the Merger Policy, each pre-merger MEC selects a four-member Merger Committee to negotiate the new seniority list. These committee members have unrestricted authority to negotiate a seniority list that binds all pilots for their airline.

35. If the two MEC Merger Committees cannot agree on a new seniority list, the Merger Committees proceed to arbitration in front of a three-member panel. Each side may select arbitrators only from a list approved by ALPA.

36. Rank-and-file pilots have no opportunity to ratify the proposals that their MEC Merger Committee representatives present to the arbitrators or the final seniority list that the

arbitrators create. Consequently, the only pilots with a voice in the seniority-list combination are well-connected insiders who have advanced through the political ranks of ALPA.

37. Just as the structure of the Merger Committees facilitates informal ALPA influence over combined seniority lists, the Merger Policy formalizes ALPA's ability to assure a final seniority list that favors larger pilot groups who control the votes to guarantee ALPA's place as the union for all post-merger pilots. For instance, ALPA:

- a) Compiles an approved list of ALPA-blessed arbitrators and bars the participants in arbitration from selecting anyone not appearing on ALPA's pre-constructed list;

- b) Instructs the Merger Committees through annual "orientation" programs about what ALPA wants to achieve when seniority lists are combined;

- c) Allows ALPA's president to unilaterally appoint a "neutral" mediator and to send the negotiations to arbitration;

- d) Sends the first communications to all affected pilots about the merger and the seniority list integration, setting the stage for all that follows; and

- e) Requires Merger Committee members to emphasize certain factors (career trajectory, longevity, and employment status and category) in negotiating seniority-list combinations.

38. Although the Merger Policy purports to provide a "fair and equitable" process for combining seniority lists, the United-Continental merger and ALPA's history reveal that outcomes are anything but equitable.

### ALPA stacks the deck in favor of the more numerous United pilots to prevent them from defecting to another union like the U.S. Airways pilots

39. When Continental and United announced their merger plans in 2010, ALPA's wounds from the loss of 5,400 U.S. Airways pilots were still just two years old. After the U.S. Airways pilots formed their own offshoot union, the United-Continental merger was the first large-scale test of ALPA's ability to placate the majority faction in a merger.

40. As of the merger date, United had 7,699 pilots, and Continental had 4,638 pilots. As a result, the original United pilots had enough votes to retain ALPA as the representative for post-merger United even if every Continental pilot had voted to create a new union.

41. In other words, numbers alone showed ALPA that—if the original United pilots were dissatisfied with ALPA's post-merger seniority list—those pilots could follow the lead of U.S. Airways pilots and leave ALPA as a result.

42. Dissident pilots at United even named the union they would form if ALPA did not deliver a favorable seniority list: The United Pilots Union. Upon information and belief, United dissidents were soliciting support for an independent union within months after the United-Continental merger was announced. Later, United pilot Andrew Collins formally created a "United Pilots Union" and began collecting signature cards to replace ALPA with an independent union for United pilots.

43. Just as ALPA recognized that United pilots had sufficient numbers to replace ALPA with a "United Pilots Union," ALPA had to know that former Continental pilots would become a minority in their new collective-bargaining unit. As a minority, the former Continental pilots have no ability to affect ALPA's internal politics, much less to decertify ALPA and form their own post-merger union.

44. Had the original United pilots followed through on their plans to form an independent union in the model of the U.S. Airways union, the result for ALPA would have been ruinous. The loss of nearly 12,300 pilots from post-merger United would strip ALPA of almost 25 percent of its membership and some $28.6 million in annual dues. Based on its experience after the U.S. Airways-America West merger, the challenge for ALPA was clear: engineer a combined seniority list that would mollify United pilots.

**ALPA skews arbitration results to favor politically powerful United pilots**

45. Given its clear political incentives to favor United pilots over former Continental pilots, ALPA began meddling in the supposedly neutral seniority-list arbitration from the outset. While ALPA's Merger Policy purports to offer a "fair and equitable" process for merging seniority lists, ALPA's favoritism for the more powerful United pilots was anything but fair.

46. After the Continental and United Merger Committees could not agree to a combined seniority list, ALPA convened an arbitration panel. Dana Eischen, the chairman of the arbitration panel, was selected from ALPA's pre-certified list of "approved" arbitrators. Mr. Eischen had worked for United Airlines for seven years.

47. Even before the arbitration began, ALPA tilted the playing field. During pre-arbitration discovery, Continental pilots sought critical payroll records for use in compiling the seniority list, and United pilots objected. ALPA sent its own in-house attorney, Betty Ginsburg, to attend the hearing on this dispute. Ms. Ginsburg even participated in caucuses between the attorneys for each pilot group, violating the promises of neutrality in ALPA's Merger Policy.

48. Months later, the tables were turned when United pilots sought records that Continental pilots objected to producing. But at the hearing on Continental pilots' discovery objections, ALPA sent no representative to attend—much less participate. In other words, ALPA made sure to intervene and assure that United pilots could protect information they did not want to disclose, but ALPA took no such steps for the benefit of Continental pilots.

49. ALPA was quick to disregard its own Merger Policy when doing so favored United pilots. For instance, representatives for both pilot groups recognized that the meanings of certain terms in the Merger Policy—"date of hire" and "longevity"—would be hotly disputed. The Merger Policy requires that "[i]ssues as to application or interpretation of merger policy

shall be determined by the [ALPA] Executive Council." Yet when the Merger Committees wrote to ALPA President Lee Moak for guidance about the meaning of these terms, he did not even refer to this requirement from the Merger Policy and instead stated, contrary to ALPA's rules, that the arbitrators themselves could interpret critical terms such as "date of hire."

50. Instead of complying with the Merger Policy, as a true neutral would have done, President Moak refused to publicly reveal ALPA's interpretations and instead let the arbitrators resolve the issue behind closed doors, where favoritism by ALPA would be far less detectable than in a public letter from ALPA's president. In other words, ALPA chose to disregard its own rules when doing so was convenient to its political gamesmanship.

51. From the outset of the arbitration hearings, United pilots wrapped themselves in ALPA's banner and told the ALPA-approved arbitrators that a seniority list unfavorable to United pilots would devastate ALPA. In their opening brief, the United pilots warned the arbitrators that the U.S. Airways-America West merger had "created an environment within ALPA that was intolerable, and ultimately highly destructive for the union."

52. Leaving nothing to the imagination about what United pilots could do if the new seniority list did not favor them, the United pilots even wrote to the arbitrators that U.S. Airways pilots had "outnumbered the America West pilots," and decided to form their own union after losing a seniority-list arbitration. The United pilots emphasized to the arbitrators that break-away unions are an "unacceptable result for ALPA."

53. During arbitration, panel members heard testimony from United pilot David Smith, who served on the ALPA committee that rewrote ALPA's Merger Policy. Smith warned arbitrators that U.S. Airways pilots had "form[ed] a new union and desert[ed] ALPA" in response

to an unfavorable seniority-list combination. Smith further told the panel that the loss of U.S. Airways to an independent union had been "about the sole focus" of ALPA for at least one year.

54. Nowhere does ALPA's Merger Policy state the political repercussions for ALPA are an appropriate factor for arbitrators to considering when combining two seniority lists.

55. Nonetheless, ALPA remained silent despite the United pilots' frequent invitations for the arbitrators to consider the political repercussions for ALPA of a seniority list that did not satisfy the wishes of United pilots. Upon information and belief, ALPA not only failed to prevent this message from poisoning the arbitration, it actively desired the arbitrators to remember that displeasing the majority faction of United pilots could deal a massive financial and political loss to ALPA.

56. According to its own annual report, ALPA even paid at least $19,000 to a Delta Airlines pilot, Richard Harwood, to prepare exhibits and appear at the arbitration as a key witness for the United pilots group. When the attorney for the Continental pilots asked Harwood to describe these payments at the arbitration, arbitrator Eischen refused to allow an answer.

57. ALPA paid Harwood's consulting fees even though ALPA's Merger Policy provides that "ALPA shall not, under any circumstances, pay any legal and consulting fees incurred by pilot groups involved in merger activity between any two ALPA represented carriers." And when Harwood asked ALPA if the union objected to his services as a paid witness for one faction in a seniority dispute, ALPA blessed Harwood's participation.

58. Upon information and belief, ALPA also paid each arbitrator $6,000 per day—more than double the going rate—to clear their schedules and rush the seniority-list combination. None of ALPA's governing documents and none of the pre-arbitration agreements between the

pilot groups provided for any need to combine the seniority lists with abnormal speed. Nor could ALPA have had any legitimate reason for changing the playbook in this fashion.

59. ALPA's influence over the arbitration extended even to the Merger Committee for Continental pilots. For example, the lead attorney for the Continental pilots' Merger Committee previously served as ALPA's lawyer in a suit charging ALPA with breaching its duty of fair representation in combining post-merger seniority lists.

60. At least one Continental pilot objected to ALPA about possible conflicts of interest involving the Continental pilots' Merger Committee, but ALPA did nothing in response to this complaint, apparently preferring to take advantage of any possible opportunity to influence the results of the arbitration.

61. Throughout the arbitration, the United pilots—with ALPA's support—sent a consistent message the arbitrators: Deliver a seniority list favoring the United pilots, or risk causing ALPA to lose 12,300 members to an independent union. In their final brief to the panel, the United pilots again cautioned that seniority-list mergers "pose serious problems for . . . ALPA as an institution."

62. Beyond these overt pressures for arbitrators to safeguard ALPA's membership rolls, the class is informed and believes that ALPA also used its influence behind the scenes—through orientation meetings with the Merger Committees, close relationships with key players on both Merger Committees, and other opportunities known only to ALPA—to deliver a seniority list that would keep all 12,300 pilots for post-merger United as dues-paying ALPA members.

63. ALPA's pressure paid off. In their final award, on September 3, 2013, the arbitrators even wrote that previous seniority list integrations had been "highly detrimental to ALPA," a fact that had no legitimate role in the arbitrators' decision.

64. The United pilots' faction was elated with the result. Far from leaving ALPA, the original United pilots installed Jay Heppner, a long-time United captain and ALPA insider, as the post-merger MEC chairman representing all 12,300 of the original United and former Continental pilots. Heppner was a lead proponent of the original United pilots' position on seniority-list integration and was installed in his new leadership slot just one month after the arbitrators released the combined seniority list.

### ALPA and United implement a new seniority list that strips former Continental pilots of years, and even decades, of seniority

65. Rather than creating a seniority list that was "fair and equitable" to both sides, the ALPA arbitration panel endorsed a virtual wish list for the original United pilots. ALPA was quick to present the arbitrators' new seniority list, with no questions asked, to United management for virtually instant implementation.

66. Under pressure from ALPA to reach a decision favorable to United pilots at any cost, the arbitration panel used novel, untried methods to deliver a new seniority list beset with obvious errors that all favored United pilots.

67. At arbitration, the United pilots proposed creating two seniority lists—one based on pilot longevity and one based on "career expectations," a factor that takes into account the financial health and possibilities for advancement at each pre-merger airline. The United pilots then proposed blending these lists by assigning a percentage weight to each factor. Although the United pilots' own witnesses conceded that no arbitrator has ever merged two pilot seniority lists using this odd method, the arbitrators nonetheless accepted the United pilots' wishes.

68. Beyond adopting the United pilots' unorthodox methods, the arbitrators created the "longevity" and "career expectations" lists using false data supplied by the United pilots.

69. First, the arbitrators calculated the "longevity" of certain Continental pilots by using Continental Airlines data that the airline itself disowned as inaccurate. According to the airline's custodian of records for this data, the inputs used by the arbitrators were "taken from a now obsolete database that was maintained at Continental over many years and by many different individuals." The airline's records custodian further explained that "we know that there are errors in the data," and that the critical dates of hire relied on by the arbitrators "never had cause nor reason to be challenged or verified." Nonetheless, the arbitrators indulged the United pilots' insistence and decided Continental pilots' "longevity" using this undisputedly inaccurate data.

70. Second, the arbitrators determined Continental pilots' relative "career expectations" by consulting, as the United pilots proposed, only *domestic* financial data for the pre-merger airlines. Had the arbitrators looked beyond the United pilots' incomplete data, they would have encountered evidence in the record that United furloughed ten times as many pilots as Continental after September 11, 2001 and that United lost $7.8 billion during the decade preceding the merger while Continental earned a profit of $1 billion. According to their opinion, the arbitrators took no account of these facts when compiling the merged seniority list.

71. The arbitrators' one-sided reliance on the United pilots' position yielded results that were equally one-sided. Most Continental pilots received a seniority rank hundreds or thousands of slots lower than what they would have received in a neutral arbitration unaffected by ALPA's political preference for the more numerous United pilots. For example, Plaintiff Kelly L'Roy's seniority rank on the arbitrators' list is 2,370 slots below the spot he would have occupied on the merged seniority list proposed by Continental pilots.[1]

---

[1] The other class representatives suffered similar losses of seniority. Carr's seniority rank was 2,171 spots lower on the arbitrators' list than on the Continental pilots' proposed list; Kathan's rank was 2,221 spots lower; Meier's rank was 495 spots lower; Mulhall's rank was 1,277 spots lower; and Mund's rank was 2,119 spots lower.

72.     The inequitable effects of the arbitrators' award are further evident from the arbitrators' creation of extremely large seniority "tiers" consisting of pilots from a single airline. For example, two Continental pilots hired on the same day—October 9, 1989—had for decades occupied directly adjacent slots on the Continental seniority list. However, these same two pilots are now 390 slots apart—with only United pilots in between them.

73.     By creating these large "blocks" of United pilots on the new seniority list, the arbitrators gravely diluted the power of former Continental pilots to bid on new job openings that feature better working conditions. In fact, the bottom 60 percent of the Continental seniority list suffered devastating losses of bidding power as a result of the arbitrators' award.

74.     After reviewing the arbitrators' decision, even Ted Reed—a neutral reporter who has covered the airline industry for 20 years—wrote in a leading financial-industry publication that the ALPA arbitration "finding tilts strongly toward the proposal made by United pilots," and "reflects the impact of the controversial 2007 seniority ruling in the merger between US Airways and America West."

### COUNT I: BREACH OF THE DUTY OF FAIR REPRESENTATION

75.     Plaintiffs incorporate the allegations in paragraphs 1 through 74 as if fully set forth herein.

76.     As the union representing former Continental pilots, ALPA owed—and still owes—a duty to fairly represent the class members even when discharging that duty is at odds with the internal union politics of ALPA insiders.

77.     A union arbitration award need not be taken as final and must be vacated when a union fails to satisfy its duty to fairly represent participants in the arbitration.

78. As described in paragraphs 1 to 74 above, ALPA breached its duty to fairly represent the class by acting in a bad-faith, discriminatory, and arbitrary manner toward former Continental pilots during the integration of the United and Continental pilot seniority lists.

79. Upon information and belief, ALPA engaged in improper activities to skew the results of the arbitration far beyond the known instances of misconduct described above. Even the known conduct demonstrates ALPA's bad-faith favoritism toward the more politically powerful United pilots.

80. As a direct and proximate result of ALPA's conduct, the Class has suffered harm in the form of lost earnings, lower earning capacity, lower quality of work, and countless other injuries associated with the loss of the contractual seniority rights to which they are entitled under their collective bargaining agreement.

81. Based on ALPA's failure to fairly represent the class members, the arbitrators' decision was erroneous and was unduly slanted in favor of United pilots. As a result of ALPA's breach of its duties and its interference with the arbitrators' decision, the decision should be set aside, and ALPA should be ordered to convene—and then refrain from interfering with—new proceedings to merge the Continental and United pilot seniority lists.

82. Plaintiffs are further entitled to an award of attorney's fees and court costs under the Railway Labor Act and the numerous decisions recognizing that such fees are recoverable under federal common law for a union's breach of its duty of fair representation.

## JURY DEMAND

83. Plaintiffs respectfully demand a trial by jury on all claims and issues triable to a jury. The requisite fee was paid in connection with the filing of this original complaint.

**PRAYER FOR RELIEF**

84. For the reasons above, Plaintiffs seek equitable, declaratory, and injunctive relief, including a judgment:

   a) Vacating the September 3, 2013 Opinion and Award of ALPA's Seniority Integration Arbitration Board;

   b) Ordering ALPA to disregard the List and to reconvene new proceedings to integrate the pilot seniority lists of United and Continental;

   c) Ordering ALPA to refrain from interfering in the new proceedings;

   d) Ordering ALPA to take all steps necessary, including amendment of the collective bargaining agreement for post-merger United pilots, to cause United management to disregard the vacated seniority list and unseat pilots from positions they occupied by virtue of the vacated seniority list;

   e) Awarding attorney's fees and court costs to the class; and

   f) Awarding all other relief at law or in equity to which the class may show itself entitled.

                                        Respectfully submitted,

                                        **AHMAD, ZAVITSANOS, ANAIPAKOS,**
                                        **ALAVI & MENSING P.C.**

                                        */s/ Joseph Y. Ahmad*
                                        Joseph Y. Ahmad
                                        *Attorney in Charge*
                                        State Bar No. 00941100
                                        Southern District No. 11604
                                        1221 McKinney Street, Suite 3460
                                        Houston, Texas 77010
                                        Telephone: 713-655-1101
                                        Facsimile: 713-655-0062
                                        joeahmad@azalaw.com

                                        **ATTORNEYS FOR PLAINTIFFS**

**OF COUNSEL:**

**THE LAW OFFICES OF**
**HOWARD T. DULMAGE PLLC**

Howard T. Dulmage
State Bar No. 24029526
Southern District No. 28826
2323 Clear Lake City Boulevard, Suite 180 MB186
Houston, Texas 77062
Telephone: 281-271-8540
Facsimile: 832-295-5797
howard@dulmagelaw.com

**AHMAD, ZAVITSANOS, ANAIPAKOS,**
**ALAVI & MENSING P.C.**

Adam Milasincic
State Bar No. 24079001
Southern District No. 1339915
1221 McKinney Street, Suite 3460
Houston, Texas 77010
Telephone: 713-655-1101
Facsimile: 713-655-0062
amilasincic@azalaw.com