```
 1                 IN THE UNITED STATES DISTRICT COURT
                   FOR THE SOUTHERN DISTRICT OF TEXAS
 2                          HOUSTON DIVISION

 3
    MICHAEL A. CARR, et al.,      )
 4                               )
         Plaintiffs,             )
 5                               )        NO. H-14-CV-451
    v.                           )        July 31, 2014
 6                               )
    AIR LINE PILOTS              )
 7  ASSOCIATION INTERNATIONAL,   )
                                 )
 8       Defendant.              )

 9

10                       INITIAL CONFERENCE
                 BEFORE THE HONORABLE LEE H. ROSENTHAL
11

12

13

14   For the Plaintiffs:        Adam A. Milasincic
                                Ahmad, Zavitsanos, Anaipakos,
15                                 Alavi & Mensing, PC
                                1221 McKinney, Suite 3460
16                              Houston, Texas 77010

17                              Howard T. Dulmage
                                The Law Office of Howard T.
18                                 Dulmage, PLLC
                                2323 Clear Lake City Blvd.
19                              Suite 180 MB186
                                Houston, TX  77062
20

21   For the Defendant:         Michael E. Abram
                                Cohen Weiss Simon, LLP
22                              330 West 42nd Street, 25th Floor
                                New York, NY  10036
23
                                J. Alfred Southerland
24                              Shellist | Lazarz | Slobin LLP
                                11 Greenway Plaza, Suite 1515
25                              Houston, TX  77046
```

```
 1                              Marcus C. Migliore
                               Air Line Pilots Association
 2                              1625 Massachusetts Ave., NW
                               Washington, DC  20036
 3
        Court Reporter:         Bruce Slavin, RPR, CMR
 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
        Proceedings reported by mechanical stenography and produced
25      by computer-aided transcription.
```

|   | 1 | THE COURT:  Is everybody here in the Carr case? |
|---|---|---|

1          THE COURT:  Is everybody here in the Carr case?

2  We'll go ahead with you.

3              Come on up.  Go ahead and state your

4  appearances, please.

09:28   5          MR. MILASINCIC:  Good morning, Your Honor.  Adam

6  Milasincic and Howard Dulmage for the Plaintiffs.  And we

7  also have with us today Andrew Elkouri, who is one of our

8  summer associates from the University of Chicago.

9          THE COURT:  Oh.  Great.  Good school.  I went

09:28  10  there, too.

11          MR. ABRAM:  Good morning, Your Honor.  Mike Abram

12  along with Marcus Migliore and Al Southerland for ALPA.

13          THE COURT:  So, we have a couple of pending

14  motions.  Let's address those to begin with.  Let's take up

09:29  15  the motion to dismiss first.  Okay?

16          MR. ABRAM:  Your Honor, would you like me to

17  proceed?

18          THE COURT:  That's fine.

19          MR. ABRAM:  Okay.  Great.  So, thank you, Your

09:29  20  Honor --

21          THE COURT:  And let's assume, first, that I am not

22  going to look at anything that would require me to convert

23  to a summary judgment motion.  I am testing merely the

24  sufficiency of the pleadings.

09:29  25          MR. ABRAM:  Thank you, Your Honor.

1          THE COURT:  Let's start with that premise.

2          MR. ABRAM:  Okay.  Thank you.

3              So, the Plaintiffs have a responsibility here

4      to plead facts which, if proven, would show that ALPA, in

09:29   5      bad faith, interfered with, manipulated and, as they put it,

6      skewed the arbitration between the Continental pilots and

7      the United pilots, the pre-merger groups.

8          THE COURT:  I don't think anybody disagrees about

9      what the legal standard is under Rule 12(b)(6) or --

09:30  10          MR. ABRAM:  Right.

11          THE COURT:  -- as applied to the duty of fair

12      representation.

13          MR. ABRAM:  Right.  And I think that's absolutely

14      correct, Your Honor.

09:30  15              So, the question is what facts have they pled

16      that would establish that, and, for that purpose, our motion

17      is that they have not pleaded sufficient facts to make out

18      that case.

19              They claim, first of all, that ALPA had a

09:30  20      motive to do something to interfere.  Okay.  So, that would

21      be a fact which, if proven, would be an important fact in

22      this case, but -- So, let's just assume that to be the case

23      for purposes of this motion.

24              The question is, though, what did ALPA

09:30  25      actually do that they plead that ALPA actually did that

1    would seriously undermine the integrity of the arbitration

2    as *Hines v. Anchor Motor Freight* requires.

3             And here we have a group of facts that they

4    allege to be facts and that we have to assume to be true:

09:30   5    First, that the arbitrators were paid more money than the

6    normal going rate for their work in order to expedite the

7    arbitration.  There were three arbitrators.  And, so, that

8    is an alleged fact that does not show any interference with

9    the integrity of the process.  It doesn't suggest that the

09:31  10    arbitrators were corrupted by ALPA and, in fact, the

11    Plaintiffs concede that they're not claiming that the

12    arbitrators were corrupted.

13             The reality is that the money for that process

14    comes from the two MECs, not from the home office.  Each of

09:31  15    the pilot groups has to pay through their budget for that

16    arbitration.

17        THE COURT:  When you say "the reality is", is that

18    a summary judgment reality or is that a pleading sufficiency

19    reality.

09:31  20        MR. ABRAM:  Pleading sufficiency reality because it

21    is based upon the -- it's the Merger Policy, which is

22    central to their complaint.  So, we do rely on documents

23    that they've referred to in their complaint and that are

24    central to their complaint.

09:32  25        THE COURT:  All right.  Standard.

1          MR. ABRAM:  So, that's part of it, and that's in

2     our motion and Merger Policy which they address in their

3     complaint.

4               The second and, of course -- the second thing

09:32   5     they say is that an ALPA attorney was present for one

6     discussion about documents to be produced in the arbitration

7     payroll records, but that doesn't show any interference with

8     the arbitration.  It just shows that somebody was present

9     for that.  And they allege that a lawyer wasn't present for

09:32   10     another occasion when there was another objection, but they

11     don't in any way show how that interfered with the -- or

12     hurt the Plaintiffs in any way in the arbitration.

13               They say that there was an alleged conflict on

14     the part of a Continental pilot who was a Continental

09:33   15     representative and that ALPA didn't investigate that alleged

16     conflict.  But the documents that are, in fact, central to

17     the complaint -- the Merger Policy as well as the Protocol

18     Agreement between the Continental and United pilot groups --

19     show that the -- all of these -- the arbitrators were

09:33   20     selected and the -- excuse me -- the representatives were

21     elected by their own pilots, by their own Continental MEC

22     pilots; and the Plaintiffs don't allege that their own

23     representatives were corrupt, were acting against their own

24     interests in the seniority integration.  And, in fact, the

09:33   25     documents that are referred to and that are central in the

1   complaint, including the award itself, as well as the briefs

2   of the two committees, show clearly that the Continental MEC

3   representatives, the Continental pilots, argued vigorously

4   for the interests of the Continental pilots in that process.

09:34   5           They complain about the fact that ALPA changed

6   its Merger Policy to include longevity as a factor in the

7   arbitrations, in the seniority integration.

8           Okay.  So, first of all, longevity is -- it's

9   hard to argue that that's somehow a bad faith act to include

09:34  10   length of service in a seniority integration, but it was

11   done and, again, the documents show clearly -- the ones that

12   are referred to in the complaint -- that it was done before

13   the United-Continental arbitration, before the merger took

14   place.  Before the merger was even announced it was done.

09:35  15   It was a general application throughout the Union.

16           Mr. Brucia, who was one of the Continental

17   pilots on the -- and chairman of their committee

18   representing the Continental pilots in the arbitration, was

19   a member of the committee -- and he testified as such and

09:35  20   that's also referred to -- in order to get the -- in order

21   to make that change.  The change to include longevity is

22   simply a recognition of the importance of that factor in

23   seniority integration.

24           Now, in the arbitration itself, as Plaintiffs

09:35  25   point out, the United pilot group argued that including

1    longevity was a very important change.  The Continental

2    pilot group, again, as the briefs show, argued that it

3    wasn't such an important change and they didn't want

4    longevity to be considered, and their proposal, as the

09:36    5    arbitration award says, was to not include longevity.

6             So, there was a big dispute between the two

7    committees over the importance of longevity.  And the United

8    pilots quite appropriately argued, well, this was a very

9    important change, look at what had happened before, and

09:36    10    their arguments are all laid out in the arbitration award as

11    well as the Continental pilots argument.  It's all there.

12             And the Plaintiffs complain that ALPA didn't

13    stop the United pilots from making that argument, but ALPA

14    wasn't a party to the arbitration.  The arbitration was

09:36    15    between these two groups.  The Continental pilots, through

16    their own counsel and their own committee, testified and

17    made arguments on that very subject.  They handled it for

18    themselves.  They took care of it themselves.  That was

19    their job and they did it.

09:36    20             The Plaintiffs complain that the arbitrators

21    were selected by a list -- from a list preapproved by ALPA.

22    Well, that was their decision, the Continental pilots and

23    the United pilots.  That's in the record.  That's in the

24    protocol.  It's right there.  That is central to the

09:37    25    complaint, that they -- that was how this was done.  They

 1    had the right, under the Merger Policy, to do it any way

 2    they wanted and they chose to do it that way.

 3              In the end, what they're really trying to say

 4    is that they are not in any way to be bound by anything that

 5    their own representatives did, that if their

 6    representatives, the Continental pilot representatives, who

 7    were elected by the Continental MEC, who are, in turn,

 8    elected by the Continental pilots -- if those pilots didn't

 9    complain about what happened, if they didn't object to the

10    arguments the United pilots made, if they approved the

11    selection of the arbitrators, if they agreed to the payment

12    of these fees, whatever it is, whatever they did, and that

13    they didn't follow any of the procedures that were available

14    to them to object to any of this within the arbitration or

15    to object to United Airlines -- which they had a right to do

16    as a union group -- If they didn't do any of these things,

17    then it didn't matter to the Plaintiffs; the Plaintiffs are

18    strangers to this; they had nothing to do with this.  But

19    that's not the law.

20              There are two laws that say exactly the

21    contrary.  One law is the Railway Labor Act, which governs

22    these labor relations, which say, 'Folks, you have got a

23    union.  You're bound by what your union does for you unless

24    you show' --

25              THE COURT:  It's not so much being bound by what

1   the arbitrators did.  It's being bound by the position the

2   union representatives took in the arbitration.

3              MR. ABRAM:  That's correct, Your Honor.

4              THE COURT:  It's a kind of estoppel.

09:38   5              MR. ABRAM:  Exactly.  It's always saying, you know,

6   that, since the union representatives didn't complain,

7   you're in privity with them and you're bound by their

8   failure to complain.

9                   In this case, if it were true and if the

09:39   10  Plaintiffs had alleged with facts that would sustain the

11  case that their representatives, the Continental

12  representatives, were in bad faith, that they were acting

13  against their own interests because --

14             THE COURT:  They breached their own duties.

09:39   15             MR. ABRAM:  Right.  If they had alleged that, okay,

16  we'd have a case to deal with here.  But that's not what

17  they're alleging.

18                  They insinuate here and there that, well,

19  these are ALPA insiders, they have been around a long time.

09:39   20  But they don't say, nor could they say in good faith, that

21  those pilots who were elected by their own MEC -- that those

22  pilots had -- were in any way corrupted in order to

23  subordinate the interests of the Continental pilots in the

24  seniority integration, which was going to affect them for a

09:40   25  long time to come, as well as to affect themselves -- that

1    they were in some way suborned or corrupted by ALPA's desire

2    not to lose members.  They don't say that nor could they say

3    that.

4              So, given all that --

09:40   5         THE COURT:  Of course, the allegations are, if you

6    will, two concerns.  And I am happy to have you address

7    these and then I will hear from counsel for the Plaintiffs.

8              One is that the allegations, of course, don't

9    focus on what the Continental pilot representatives did.

09:40   10   The allegations, instead, focus on what the ALPA

11   representatives or the ALPA entity did and didn't do,

12   ranging from compiling a list of potential arbitrators,

13   helping United before the arbitration, not by sending the

14   in-house lawyer to assist in discovery, not offering that to

09:41   15   Continental, allowing the arbitrators to intercept words in

16   a merger policy that the Plaintiffs say is against the

17   Merger Policy, allowing the United pilots to use the threat

18   of decertifying ALPA post-merger as an argument for the

19   seniority list to favor United pilots -- I mean, keep going

09:41   20   down the line and admitting that ALPA remained silent -- and

21   I'm not sure how that cuts -- but arguing, at least, that

22   ALPA was in some fashion not neutral in this respect, that

23   ALPA hires a consultant, the nineteen-thousand-dollar issue.

24             As I understand it, your key evidence about

09:41   25   that comes from Mr. Hamilton's declaration.  There, I'm not

1    sure I can properly consider that under 12(b)(6) --

2            MR. ABRAM:  I understand that, Your Honor.  We'll

3    deal with that in a minute, if we could.

4            THE COURT:  Payment of the arbitrators at more than

09:42    5    the going rate.  I am a little unclear how that's a breach

6    of duty at all, since there is no allegation that the

7    arbitrators themselves were corrupt.

8                So, those allegations don't have anything to

9    do with what Continental did or didn't do in terms of its

09:42    10    pilot representatives' positions during the arbitration.

11            MR. ABRAM:  Well, if I may.  Some of those, that's

12    correct, but some of them no, because to the extent that

13    they're complaining about acts that took place during the

14    hearing the --

09:42    15            THE COURT:  The failure to object.

16            MR. ABRAM:  The failure to object.  But putting

17    that aside, putting aside the failure to object, none of the

18    acts that they allege that the entity, as Your Honor put it,

19    did are sufficient to show that -- if proven, would show --

09:42    20    would enable a factfinder to determine that ALPA had

21    seriously undermined the integrity of that arbitration.

22    That is what we are arguing on that, that --

23            THE COURT:  My next question bears on just that

24    point, which is that, as I compare the nature of specificity

09:43    25    of the allegations in other cases that have either granted

```
 1    motions to dismiss, breach of duty, fair representation

 2    claims, or denied them -- the allegations in this case look

 3    pretty good compared to those that have bombed early.  That

 4    is, they are not entirely conclusionary by any means; they

 5    are specific.

 6              You may disagree on whether, if proven, the

 7    allegations of specific breaches on the part of ALPA would

 8    be sufficient to show a breach, but if the issue is

 9    specificity, detail, inferences that could be raised by

10    virtue of the detail, these allegations look more like those

11    that have passed muster than those that have been sent

12    packing early.

13         MR. ABRAM:  Your Honor, if I may just address that,

14    because I think that's the crux on that part of it,

15    obviously.

16              THE COURT:  Right.

17         MR. ABRAM:  And that is that I do disagree and ALPA

18    does disagree that these allegations would be sufficient to

19    bring about a ruling, a verdict, that ALPA had violated its

20    duty of representation or a judgment by this -- that none of

21    them show the kind of dishonest conduct, fraud, deceitful

22    action, which substantial evidence is required under

23    Lockridge to show that ALPA seriously undermined the

24    integrity of this arbitration, that these arbitrators, these

25    three arbitrators who wrote an extensive opinion, were
```

1    influenced to come out the way they did because of those

2    things that the courts --

3          THE COURT:  Of course, it can be arbitrary rather

4    than -- I mean, it's arbitrary or in bad faith.

09:45   5          MR. ABRAM:  Either way, although they do focus on

6    it being bad faith.  But, either way, arbitrary is, you

7    know, wholly unreasonable.  And, either way, you still have

8    to show, under *Hines*, that it seriously undermined the

9    integrity --

09:45   10          THE COURT:  I agree.

11          MR. ABRAM:  -- and that's what's lacking.  You

12    can't leap to that because these three arbitrators -- There

13    is not a single thing here that would lead any fair-minded

14    person to believe that these three arbitrators came out the

09:45   15    way they did because of any of these things.  Even if ALPA

16    itself, the entity, had acted in bad faith, the

17    arbitrators -- you know, that they were somehow affected by

18    that?  There is not the slightest reason to think that, and

19    that's what we're going to wind up with.

09:46   20          Putting aside the question of failure to

21    complain and exhaustion, which I think is a separate ground

22    that stands alone, the one fact question that is -- we say

23    is a summary-judgment-type question is this question of the

24    fees.

09:46   25          The policy does state that expenses -- and

1   this is the Merger Policy -- expenses of mergers are to be

2   borne by the respective MECs, not by ALPA, and this would

3   obviously be an expense like that, that ALPA itself, the

4   treasury home office, would not be able to pay.  That's the

09:46  5   policy.

6           So, I think that's sufficient in itself.  But

7   if there was some doubt about whether the Union followed its

8   policy, we did put in that declaration, and if that's the

9   only thing that they think is -- If the Court winds up at

09:47  10   the point and says, 'Well, I am worried about that.  I don't

11   want to make a decision without that being resolved,' we'd

12   be very happy to make that available for discovery.  We can

13   make whatever is needed for that to be available for

14   discovery.  We've put in the declaration, we've put in the

09:47  15   records, and we can put in the deponent, the declarant, and

16   make them available or somebody else like him.  That's not a

17   problem.

18           I still think, no matter what, you still have

19   the fact that all of this happened under the watchful eye,

09:47  20   whatever happened -- which we say is nothing -- but, if

21   something happened, it happened under the watchful eye of

22   the Continental pilots' own representatives, who did not say

23   a word that would say to ALPA, you know, 'Folks, you know,

24   you're messing up here.  This is not being fair.  This

09:47  25   happened, this happened and this happened and you have got

1  to do something about it.'

2          The Union, under McCaskill-Bond as well under

3  the decisions like *Rakestraw* in the Seventh Circuit that say

4  that this procedure satisfies the union's duty -- the union

09:48   5  is entitled to rely on the representatives of both groups to

6  do their jobs.

7          THE COURT:  Well, I guess my question is -- You

8  talk about whether the arbitrators acted arbitrarily or in

9  bad faith.  That's not the focus.  It's whether the union

09:48   10  acted arbitrarily or in bad faith.  Right?

11          MR. ABRAM:  I don't talk about that.  I talk about

12  whether --

13          THE COURT:  Okay.  Maybe I misunderstood.

14          MR. ABRAM:  *Hines* says that the integrity of the --

09:48   15          THE COURT:  I agree with that.

16          MR. ABRAM:  -- must have seriously been undermined.

17          THE COURT:  Right.

18          MR. ABRAM:  So, for them to have been seriously

19  undermined --

20          THE COURT:  Fairness or integrity of the arbitral

21  process --

22          MR. ABRAM:  That's right.

23          THE COURT:  -- must have been --

24          MR. ABRAM:  That's right.

25          THE COURT:  -- seriously undermined.

1          MR. ABRAM:  Right.  And I don't see how any of that

2     would do it.  And especially if it were -- again, the

3     Continental pilots were present taking care of themselves

4     and the union was entitled to rely upon that fact as part of

09:48   5     the process, under both the Railway Labor Act and under

6     McCaskill-Bond, which, although the Plaintiffs don't want to

7     spend much time thinking about McCaskill-Bond, it is an

8     expression of congressional intent that the union and the

9     company implement their internal policies and, under that

09:49  10     procedure, the union sets this up, makes it available.

11          The pilots pursue it and the union is entitled

12     to rely upon their own integrity and self-worth, protecting

13     the interests of their own pilots, which, clearly -- if you

14     read the decision, Your Honor, they clearly fought hard for

09:49  15     the interests of the Continental pilots.

16          THE COURT:  So, is it your position that merely

17     reading the arbitration award, not going back and looking at

18     the underlying transcripts and hearings and all of that

19     documentation, is sufficient to rule as a matter of law that

09:49  20     the integrity and fairness of the process was intact?

21          MR. ABRAM:  It is in this case because of the

22     failure to make allegations of fact that would tend to show

23     otherwise.

24          But, in addition, of course, Your Honor, the

09:50  25     Plaintiffs rely upon the arguments that were made, and we

1  have submitted the excerpts from the briefs that they

2  referred to.  We've referred to the testimony.  We have

3  submitted that excerpt.  And the Court can clearly see for

4  herself that these were simply hard-fought issues between

09:50  5  the Continental and United pilots.

6  THE COURT:  Okay.  All right.  Let me hear from

7  Plaintiff.

8  MR. ABRAM:  If I may, just one last thing, Your

9  Honor, before we all forget, and that is that, in the end,

09:50  10  if the Court does decide not to dismiss the case -- and I am

11  certainly hoping otherwise -- but if that were to happen, as

12  we have pointed out, we really shouldn't be going forward

13  here until United has been joined.  Under McCaskill-Bond

14  they're obligated to accept the result of the Merger Policy

09:50  15  and they have done so.  They have included the award in the

16  collective bargaining agreement that --

17  THE COURT:  They haven't sought to intervene.

18  MR. ABRAM:  Say again, Your Honor.

19  THE COURT:  They have not sought to intervene.

09:51  20  MR. ABRAM:  They have not.  We have notified them

21  about the case.  They kind of think that ALPA will protect

22  their interests, but I don't believe that's the case.  The

23  Court can't change the agreement without their being

24  present.

09:51  25  THE COURT:  Well, I wouldn't change the agreement.

1   I would leave something in place that might require them to

2   change it, but why wouldn't -- Look.  I will phrase it this

3   way.

4              What's the significance of the fact that this

09:51  5   sophisticated entity that has hot-and-cold-running lawyers

6   themselves has apparently not seen the necessity of filing a

7   motion for leave to intervene?

8        MR. ABRAM:  I will just give you my personal

9   impression of dealing with United Airlines.

09:51  10        THE COURT:  What's the legal significance?

11        MR. ABRAM:  I appreciate that.  The legal

12   significance is -- I believe there is none, because I

13   believe and based on what they've told me that they think

14   the case will not get to the point where there would be a

09:52  15   judgement that would affect their agreement.

16             THE COURT:  And who am I to interfere with their

17   business and legal judgments about what they need to worry

18   about?

19        MR. ABRAM:  Because, if ALPA was subject to an

09:52  20   order, Your Honor, that it had to go through this process

21   and come up with a new award, we have no ability to compel

22   United to accept that.  They have accepted and included in

23   their agreement a whole -- and lots of things have depended

24   upon that having taken place.

09:52  25             When you change the seniority you're going to

1    be changing a great deal -- or whoever would change it or

2    change it for these plaintiffs -- would change a great deal

3    in that agreement; and, so, we can't do that unilaterally.

4            THE COURT:  What's your best case for requiring an

09:52    5    employer to be joined in a breach of fair duty, a

6    representation case between a union and a union member?

7            MR. ABRAM:  I am not going to be able to cite you

8    the best case in that respect, Your Honor, but I would say

9    that in most of the cases the plaintiffs are seeking damages

09:53    10    from the union.  In this case they are not.  They're seeking

11    equitable relief in the form of an order on their own behalf

12    and, ultimately, they would like, on behalf of the class, to

13    change the arbitration -- have a new arbitration and a new

14    award which would then -- ALPA would then have to try to

09:53    15    incorporate in the agreement with United, which ALPA does

16    not have the power to do.

17            And it's simply the fact that the Union is

18    just one party to an agreement that the Plaintiffs are

19    proposing to change.  It's just standard, in my view,

09:53    20    joinder law, that they should be joined.

21            THE COURT:  There is a difference between "could

22    be" and "should be".

23            MR. ABRAM:  Correct, Your Honor.  I said "should"

24    and maybe it's "could", but I think "should".  Thank you.

09:53    25            MR. MILASINCIC:  Thank you, Your Honor.

1        I will take up first the issue of this

2   internal exhaustion argument that's been made, which I think

3   can be dispensed with fairly quickly or could even be

4   dispensed with, as Your Honor has pointed out, by declining

09:54   5   to look, at this stage, at anything beyond what's in the

6   pleadings, because all of these internal exhaustion

7   arguments do rely entirely on exhibits that are wholly

8   outside the pleadings and that do not relate to our

9   allegations.

09:54   10        Their essential argument here is that all of

11   the 4,600 Continental Airlines pilots --

12        THE COURT:  What about the failure to -- Well, is

13   there any evidence that I can -- proper evidence,

14   information -- disclosed in the pleadings and the documents

09:54   15   that are appropriately considered under 12(b)(6)?  Is there

16   information available in that universe that would enable me

17   to assess sufficiently the impact of the positions taken by

18   the Continental representatives elected by the Continental

19   pilots?

09:55   20        MR. MILASINCIC:  Actually, Your Honor, there are

21   two items that we refer to in the complaint, one of which is

22   the Merger Policy itself that can be considered.  And the

23   significance of what's in there, as we point out in our

24   brief, is that these documents we have referred to in the

09:55   25   complaint point out that neither the merger committee

1    members themselves nor even the arbitrators themselves, let

2    alone the rank and file pilots, have any authority, after

3    the award has been announced, to go back and challenge it or

4    appeal it in any way within the union.

09:55    5              Even as to the arbitrators they are prohibited

6    by ALPA Merger Policy from changing the award, reversing the

7    award.  All they can do is interpret the award with the

8    understanding that it was valid and will continue to be

9    valid unless the Court --

09:55    10    THE COURT:  What about the position taken

11    pre-award?  What information is available -- Let's set aside

12    for the moment the absence of post-award challenges, which I

13    think your point is there wasn't any avenue to do that,

14    although you're here.  What about the argument that,

09:56    15    pre-award, there was apparent acquiescence?  What sources of

16    information do I have properly considered under 12(b)(6) as

17    to that?

18    MR. MILASINCIC:  The only one would be the Merger

19    Policy, which specifies that these rank and file pilots have

09:56    20    no role in selecting these merger committee representatives

21    who, supposedly, were in privity with all 4,600 pilots.

22    THE COURT:  What you're saying is, even assuming

23    everything he says is right, these representatives were not

24    in a relationship to Continental that would give rise to

09:57    25    this estoppel effect?  Is that what --

1          MR. MILASINCIC:  These representatives were not in

2     a relationship to the individual Continental pilots that

3     would give rise to any estoppel effect.

4          THE COURT:  Who picked them?

09:57  5          MR. MILASINCIC:  The merger committee

6     representatives appoint --

7          THE COURT:  Who picked the Continental people on

8     the merger committee?

9          MR. MILASINCIC:  There is an election for the

09:57  10    executive committee, and the executive committee then

11    appoints this subset of individuals.

12         THE COURT:  And who elects the executive committee?

13         MR. MILASINCIC:  It's a group-wide vote by the

14    pilots for a given airline.

09:57  15         THE COURT:  And is there a United election and a

16    Continental election that's separate?

17         MR. MILASINCIC:  There was prior to the seniority

18    arbitration.  But an important thing is that, since that has

19    occurred and as we have alleged in the complaint, that those

09:57  20    two entities have been collapsed --

21         THE COURT:  I asked about that before, because

22    we're talking about who picked the Continental

23    representatives.  And what you're telling me is that it

24    ultimately did get picked by the Continental pilot

09:58  25    membership because they elected the executive committee who

1    picked the Continental slots.

2              MR. MILASINCIC:  Well, it's a very indirect --

3              THE COURT:  It doesn't sound indirect to me.

4              MR. MILASINCIC:  Well, they're not electing the

09:58    5    folks who take the positions that bind them, allegedly, in

6    the arbitration.  And the reality is that, even if these

7    were direct elections --

8              THE COURT:  Wait.  Let me back up.

9                   So, Continental has an election.  Continental

09:58   10    pilots have an election that elects the executive committee

11    pre-merger --

12              MR. MILASINCIC:  That's correct.

13              THE COURT:  -- or pre-arbitration and that

14    executive committee of only Continental pilots elected by

09:58   15    Continental pilots picks the Continental representatives?

16              MR. MILASINCIC:  That's correct.

17              THE COURT:  That doesn't sound indirect to me.

18    That sounds like Continental, Continental, Continental.

19              MR. MILASINCIC:  Sure.

09:58   20              THE COURT:  So, why isn't that the type of

21    relationship that would, properly considered as you have

22    told me under 12(b)(6) -- because it's all laid out in the

23    Merger Policy or other documents properly considered under

24    12(b)(6) -- why isn't that enough to establish the kind of

09:59   25    unity of interest that might support an estoppel theory?

1          MR. MILASINCIC:  Well, Your Honor, it's really the

2     estoppel theory itself that is the problem.  Because even if

3     these individuals were directly elected by the Continental

4     pilots we would still have the same problem.

09:59     5          THE COURT:  Which is?

6          MR. MILASINCIC:  That what these merger committee

7     representatives supposedly should have done would be object

8     to evidence or write letters complaining about things in

9     real-time as they came up.

09:59    10          THE COURT:  Or argue vigorous -- Are they present

11     at the arbitration?

12          MR. MILASINCIC:  The merger committee

13     representatives are.  That's right.

14          THE COURT:  So, what about objecting there?  How

09:59    15     about making arguments that this is unfair, that this is

16     designed only to further ALPA's interests post-merger rather

17     than designed to be a neutral and fair treatment of the

18     merged pilots?

19          MR. MILASINCIC:  Yes.  That's exactly correct.

10:00    20     They could have done all those things at the time if somehow

21     before the award was announced they were able to recognize

22     then, in real-time, what was happening, what the

23     significance of all these isolated incidents together would

24     be.  I mean, until the award was announced, there was no way

10:00    25     that they could have recognized what the effect of these

1   actions were going to be, and there could be strategic

2   reasons to pull punches along the way.

3          THE COURT:  What is your best case for saying that

4   there is no pre-award estoppel effect?  I understand your

5   argument there is no post-award sort of estoppel, slash,

6   failure to exhaust argument because of the limits on the

7   ability to do anything post-award.  I'm not saying I agree

8   with it, but I understand the argument.

9               What is your legal authority for saying, yes,

10  they were there as the duly elected Continental

11  representatives selected by Continental, but the fact that

12  they sat on their hands is not something to be -- it doesn't

13  block claims because they didn't have sufficient information

14  that would enable them to appreciate the significance of the

15  ALPA-skewing that was going on?

16          MR. MILASINCIC:  Your Honor, our reliance there is

17  more on the absence of any authority supporting this

18  estoppel argument that the Plaintiffs are raising, because

19  all they have cited to the Court are very typical

20  res judicata type cases that we have no disagreement.

21          THE COURT:  Yeah.  But this is different from

22  typical res judicata.

23          MR. MILASINCIC:  Right.

24          THE COURT:  This is not res judicata by virtue of

25  the award.  This is, essentially, a form of judicial

1    estoppel transported into the arbitration context.  Right?

2              UNIDENTIFIED SPEAKER:  Yes, Your Honor.  That's

3    correct.

4              THE COURT:  And judicial estoppel is a very narrow

10:02   5    doctrine, as I understand it.

6              MR. ABRAM:  Yes, Your Honor.  It's very narrow,

7    Your Honor.  And we have cited cases, such as *Acree* and

8    *Gvozdenovic* -- I have a partner who can pronounce that, but

9    I can't -- that show the union members are, we say, bound in

10:02   10   the sense that, if their representatives didn't do something

11   or if they did something, that they are bound by it, and we

12   rely on the Railway Labor Act as well as on McCaskill-Bond

13   in this instance.

14              But that's -- in respect to all this time

10:02   15   before the award, to say, when you're sitting there, that

16   you have a strategic reason for not objecting, if you see

17   the United pilot representatives making an argument about

18   why the Merger Policy changed and you don't like the way

19   that argument is going because it suggests to you that

10:03   20   somehow the United pilots are giving warning to the

21   arbitrators that they're going to wreck the union if they

22   don't rule in favor of the United pilots -- If that's what

23   you're thinking and if that's what they get from reading the

24   transcript, surely counsel and this committee of people,

10:03   25   including one guy that was on the committee that made the

1    change, would be able to say something, would know

2    something.

3         THE COURT:  But the way you just made the argument

4    leads me to my next question, which is back to you, but I

10:03   5    want to hear from the Plaintiffs' lawyers as well.

6              It sounds to me that the sources that I would

7    have to look to to determine whether this argument could

8    preclude the Plaintiffs' challenge would be outside the

9    category of information I could consider on a 12(b)(6)

10:04  10    motion.  I'd have to go into the transcripts.  I'd have to

11    explore -- I'd have to consider information about the

12    apparent significance of discrete positions that were not

13    objected to -- and the key word there is "apparent" -- at

14    the time, none of which would appear to me is really part

10:04  15    and parcel or sufficiently contained in the documents that I

16    could consider under 12(b)(6).

17         MR. ABRAM:  If I may respond to that.

18         THE COURT:  Am I right on that?

19         MR. ABRAM:  I think not, Your Honor.

10:04  20         THE COURT:  Tell me why.

21         MR. ABRAM:  All right.  We're referring to a very

22    discrete part of this case that the Plaintiffs refer to in

23    the complaint, which is the arguments made by the United

24    pilots in their brief and, for that purpose, the brief is

10:05  25    ripe, is available to you.  We have shown you the brief.

1   And the testimony of the United pilots in this part of the

2   arbitration in which Captain Smith testified for the United

3   pilots and Captain Brucia testified for the Continental

4   pilots -- and those are -- we have referred to those because

5   we regard them at the core of what they're alleging as to

6   what happened in the arbitration, that they said this

7   happened in the arbitration.  And we show the transcripts

8   showing what happened and Your Honor can see that --

9           THE COURT:  I'm not sure that every document that

10   is related to the arbitration can be considered under

11   12(b)(6) based on this expansive notion that you have

12   advanced.

13           MR. ABRAM:  There are different formulations in the

14   courts.  Some courts say it has to be at the core.  Some

15   courts say it has to be referred to.  But I will go with the

16   narrower one, that the core --

17           THE COURT:  Usually it means contracts or patents

18   or something like that.  It doesn't tend to mean the entire

19   transcript of an underlying proceeding.

20           MR. ABRAM:  Nor are we offering the entire

21   transcript, Your Honor.  We're only referring Your Honor to

22   that part of the transcript that lies at the core of the

23   complaint of the argument made by the United pilots, which

24   is regarding the significance of the change in the Merger

25   Policy and the argument -- and the testimony of the United

1    pilots regarding the significance of the change in the

2    Merger Policy, all of which, again, preceded this event.

3              So, that, we regard, as being at the core.

4              I mean, I think that, in this district, that

10:06    5    these are documents that are referred to and central to the

6    complaint.

7              I have been pointed out what we have said in

8    our -- in Document 23.

9              THE COURT:  I know of the standard.

10:07    10              MR. ABRAM:  Your Honor is familiar with the

11    standard.

12              We regard these as at the core of what they're

13    saying.  They're saying this is what happened in the

14    arbitration and the transcript, and the brief excerpts show

10:07    15    exactly what happened in the arbitration and show, on this

16    narrow point, that the Plaintiffs' representatives, the

17    Continental merger representatives, made their argument, but

18    they didn't say that this was somehow an improper argument

19    on the part of the United pilots nor -- They didn't say

10:07    20    that.  They didn't raise that issue.  Whether it was for

21    strategic, tactical or whatever reasons, they chose not to.

22    They chose to respond on the merits and that's right there.

23              So, I don't think we're going anywhere beyond

24    what's at the core of the complaint when we go into that,

10:08    25    Your Honor.

1          THE COURT:  All right.  Let me hear the Plaintiffs'

2     view of, first, the propriety of looking at this information

3     and, second, what additional information might be needed to

4     consider it fairly important.

10:08   5          MR. MILASINCIC:  Well, first, it would not be

6     proper to consider all of this extensive -- these extensive

7     exhibits that have been offered.  As the argument has just

8     shown, the purported significance of those exhibits requires

9     quite a number of inferences to be drawn in favor of the

10:08   10     Defendants.  It requires quite an elaborate explanation

11     before even identifying what those inferences are.  And to

12     have to -- And you would, to understand the entire

13     significance of it and why objections were asserted or not

14     asserted at particular points.  Reading a single page or a

10:09   15     couple of pages from a transcript would not provide the

16     Court with the full picture of what was happening there.

17          Other sources of information that would have

18     to be looked at, ultimately, would include the depositions

19     of these Continental merger committee representatives,

10:09   20     perhaps of their attorneys, if it's possible to do that

21     without stepping on privilege issues.  Those are the sources

22     that you would have to go to before you could understand why

23     these representatives did or didn't do the actions that they

24     supposedly should have taken.

10:09   25          And I would also point out to the Court that

1   all of the argument that we have just heard relates entirely

2   to one of the allegations in the complaint, that allegation

3   being that the United merger representatives talked in the

4   arbitration about the political implications to ALPA and

10:09   5   nobody objected to that.

6           Even assuming that all that's true, that

7   leaves aside every other allegation in the complaint -- the

8   payments to the witnesses, to the arbitrators -- and there

9   is no --

10:10   10   THE COURT:  No.  No.  I'm not talking about those

11   right now.  I am talking about this estoppel theory.

12           MR. MILASINCIC:  Right.

13           THE COURT:  So, your basic argument is that I

14   really can't consider any of the transcript under the

10:10   15   12(b)(6) category?

16           MR. MILASINCIC:  That's correct.  And you had asked

17   earlier, Your Honor, for our best case as to why this

18   argument fails, and I would cite the Court to *Addington v.*

19   *The U.S. Airline Pilots Association,* which is in our brief

10:10   20   at 588 F.Supp 2d 1051.  And that was a case where ALPA made

21   virtually the identical same argument that they're making

22   here, and the Court had some very well reasoned explanations

23   for why --

24           MR. ABRAM:  I don't think ALPA was a party to that.

10:10   25   Addington was against the USAPA.

1        MR. MILASINCIC:  USAPA was the named defendant in

2   that case, but USAPA was a spin-off of ALPA; and, so, ALPA

3   did participate in that litigation and takes the position --

4   And regardless of whether it was ALPA doing it or USAPA

10:11   5   doing it, the argument is --

6        THE COURT:  The estoppel --

7        MR. MILASINCIC:  -- it's the same estoppel theory,

8   the same idea that there should have been real-time

9   objections.

10:11   10       THE COURT:  Motion to dismiss or summary judgment?

11       MR. MILASINCIC:  Summary judgment.

12       THE COURT:  Does it address in any way whether it

13   could have been considered under a motion to dismiss?  The

14   case.

10:11   15       MR. MILASINCIC:  Oh.  I'm sorry.  I thought you

16   were asking for our opinion of --

17       THE COURT:  Both.

18       MR. MILASINCIC:  Well, our opinion is that this

19   issue should be decided in a summary judgment context.  I

10:11   20   honestly do not remember, without going back to look, the

21   context of *Addington*.  I believe it was dismissal, but I

22   would have to double-check.

23       MR. ABRAM:  I believe it was summary judgment, Your

24   Honor.  But in this case paragraph 50 of --

10:11   25       THE COURT:  In which case is "this case"?

1          MR. ABRAM:  In our present case, paragraphs 51

2    through 53 of the complaint specifically refer to the

3    arguments made in the opening briefs of United pilots and to

4    the testimony being made in the arbitration.

10:12    5               So, to say that you can't refer to the

6    complaint -- can't refer to the documents that are right

7    here at the core of this issue in 51 through -- I don't see

8    that.

9          MR. MILASINCIC:  Well, and that goes to what the

10:12   10   core is.  Again, we're talking about two paragraphs out of a

11   hundred and some paragraphs.  And even if you accept their

12   argument that those arguments were precluded --

13          THE COURT:  It's a defensive argument.

14          MR. MILASINCIC:  Right.

10:12   15          MR. ABRAM:  Of course.

16          THE COURT:  Basically, it's a defense argument.

17   So, the core of the complaint is a little --

18          MR. MILASINCIC:  And even if the merger

19   representatives could have objected to those particular

10:12   20   arguments about the political ramifications, we have many

21   others allegations that they don't even attempt to explain

22   what the merger reps --

23          THE COURT:  Okay.  So, let's shift a little bit

24   into the next area, not on estoppel but on the argument that

10:13   25   there was not any -- that the pleading is not sufficient to

1   show that the positions taken by the Union were arbitrary or

2   in bad faith or that they undermined in a substantial or

3   significant way the integrity or fairness of the arbitral

4   process.

10:13   5          MR. MILASINCIC:  Yes, Your Honor.  I will take

6   those in order.

7                First, as to what ALPA did.  As the Defendants

8   have already pointed out, the primary allegations that we

9   have are, first, that ALPA sent one of its own lawyers not

10:13   10   just to attend but to participate in a discovery hearing and

11   the caucuses among the parties when United pilots were

12   objecting to the production of some critical documents for

13   the case.  That, in and of itself, taking all inferences in

14   favor of the Plaintiff, would have been improper.  It became

10:14   15   even more improper when they did not offer the same

16   assistance to Continental pilots when those pilots objected

17   to producing similar information.

18                ALPA paid a witness to testify on behalf of

19   the United States pilots.  As we have alleged in the

10:14   20   complaint, that witness himself expressed to ALPA his

21   concerns about the impropriety of doing that.  ALPA not only

22   said go ahead and do it, but ALPA paid him to do it.

23                Now, we understand that they have this

24   summary-judgment-type argument that if you take some

10:14   25   reports, not the ones that we have cited, add them to

1    others, add them to the testimony of the gentleman whose

2    affidavit that they have submitted, that they have an

3    explanation for how those payments were made and why that

4    was proper.  That's fine and that's an argument that can be

10:14    5    taken up at summary judgment or in front of the jury, but

6    for motion to dismiss purposes we have alleged and have

7    reason to believe that the allegations as stated are true.

8           Additionally, there were the payments to the

9    arbitrators double the going rate and for the express

10:15    10    purpose of reaching an unusually fast resolution to this

11    arbitration.  And --

12           THE COURT:  Usually, that's a good thing.

13           MR. MILASINCIC:  In some cases it is, but the

14    Merger Policy neither provides for this extra expedited

10:15    15    procedure or the payment --

16           THE COURT:  Everybody had to make a decision here.

17    I mean, this was critical.  That argument -- that's like

18    faulting a judge for being too fast in resolving an issue

19    that's critical to the ongoing business of the litigants.

10:15    20    That I just don't -- I mean, that strikes me as:  It was

21    undermine because it was thorough but fast.

22           MR. MILASINCIC:  Your Honor, the point is the

23    payments, the doubling of the money.  And we're not alleging

24    corruption, nor do we have to.  They're very different

10:15    25    standards.

 1          THE COURT:  But that's what bothers me.  They were

 2     paid to work really hard to get this done fast because both

 3     sides needed to know.  They were running an airline.  They

 4     had the flights in the sky.

10:16  5          MR. MILASINCIC:  Right.  I mean, the Merger Policy

 6     does not provide for that.

 7          THE COURT:  So what?

 8          MR. MILASINCIC:  It was never done at any prior --

 9          THE COURT:  Business need.  That just seems to me

10:16  10   to be a weird argument.  Help me understand what I am

11     missing here.

12          MR. DULMAGE:  Your Honor, if I could jump in on

13     the -- since you bring up the "business need" point.

14               Continental and United were running their

10:16  15   flight operations separate and apart.  In fact, I'm not even

16     sure as we stand here today --

17          THE COURT:  Yeah.  But everybody knew that the idea

18     was to get the merger merged.

19          MR. DULMAGE:  But they were so far behind on

10:16  20   operationally merging things --

21          THE COURT:  I understand.

22          MR. DULMAGE:  -- but the time frame that we're

23     talking about was much quicker than needed to be under the

24     circumstances.

10:16  25        THE COURT:  Needed to be.  You had arbitrators who

1    were paid, who worked efficiently, faster than most

2    arbitrators do.  That may say more about most arbitrators

3    than it does about the speed of this process.

4              But, even if it was fast, it's thorough.  It's

10:17    5    reasoned.  How am I to conclude from the arbitration award

6    itself that -- even considering the speed and the fact that

7    there was a larger than customary or usual payment, when

8    there is no allegation that the arbitrators were bought,

9    bribed, corrupted or in any way had their own integrity

10:17    10    compromised?

11         MR. MILASINCIC:  Your Honor, on the last point, we

12    don't allege that there are -- that these arbitrators lack

13    integrity, but we do have some very specific allegations of

14    how the arbitrators' decision was affected by the Union's

10:17    15    breaches of its duty.

16         THE COURT:  I understand that, but that's different

17    from -- The point that you're making now, I have a real hard

18    time understanding the relationship between the -- I

19    understand your argument that ALPA could take positions that

10:18    20    the arbitrators would find persuasive and that those

21    positions themselves were so flawed, so not neutral, so

22    partial, that they affected the arbitral process.  That's

23    what I understand to be your key argument, if you will.

24    Am I wrong on that?

10:18    25         MR. MILASINCIC:  That's part of it, Your Honor.

1  And I think we're moving here beyond these payments, which

2  I'm happy to do.

3              Another fact that hasn't even been addressed

4  yet today is that in cases like this one where bad faith is

10:18  5  at issue, subjective intent --

6              THE COURT:  Of the union.

7              MR. MILASINCIC:  -- of the union or in the

8  analogous context of a fraud case where somebody's

9  intentional wrong-doing, attempt to mislead, bad faith, is

10:18  10  at issue, the Fifth Circuit has recognized that -- and we're

11  not saying this is, by itself, sufficient -- but one

12  additional factor to look at is, in light of the actual

13  intervention and non-intervention that we have alleged, you

14  can also consider the fact that ALPA had the motive --

10:19  15  that's not even been contested -- and that they had the

16  opportunity to do much, much more than what --

17              THE COURT:  I think that's why the focus, as I

18  understand the Defendants' argument, is on what was the

19  effect on the arbitral process.

10:19  20              MR. ABRAM:  Right.  Even allowing all the

21  inferences that Plaintiffs want, that somehow ALPA intended

22  any of these things to have an influence.  How would they?

23  What kind of case is that?

24              MR. MILASINCIC:  Well, Your Honor, we're, again,

10:19  25  not alleging that these arbitrators have taken bribes or

1    that they were corrupt.  They, as you know, are two very

2    different legal standards, totally separate theories.

3         THE COURT:  The key to this process and, I guess,

4    my final question -- because the key is process -- is

5    whether what I really need here is to understand the

6    process; and, that is, I would need the transcript to see

7    what the hearing consisted of, to see how thoroughly the

8    arbitrators had -- how thorough the information was that the

9    arbitrators had and how thoroughly they considered them with

10   what kind of openness to arguments and with what kind of

11   disciplined weighing of the various interests and arguments.

12            So, two questions, really.

13            One.  Is the smartest thing for me to do --

14   because this is, I think, the key of the case, the effect on

15   the arbitral process given your allegations.  Is the

16   smartest thing for me to do to convert to summary judgment

17   and give the parties sufficient time to supplement with the

18   transcript?  Which raises the question:  If that occurs, is

19   there any other discovery that would be appropriate, given

20   the way in which I am conceiving of the critical issues on

21   summary judgment?  That is, I don't propose -- I don't see

22   that you would need to discover the entire case in order to

23   resolve on summary judgment or some version of an entire

24   case -- to resolve on summary judgment the question of the

25   impact of the arguments made and the positions taken by ALPA

1    on the integrity and fairness of the arbitral process.

2    That's the transcript.

3              MR. MILASINCIC:  To take your first question first,

4    Your Honor, the answer is --

10:22  5              THE COURT:  How many days was the arbitration, by

6    the way?

7              MR. MILASINCIC:  I believe it was five days.

8              MR. ABRAM:  Five or six days.

9              THE COURT:  So, the transcript is not going to

10:22  10   take up -- I mean, we're not talking about trees here.

11             MR. MILASINCIC:  It's probably a binder.

12             THE COURT:  We're not talking about a forest.

13   Maybe trees, but not a forest.

14             MR. MILASINCIC:  Right.  It would be two to three

10:22  15   binders.  Right.

16             MR. ABRAM:  It's all on one CD, Your Honor.  Let's

17   put it that way.

18             THE COURT:  As administrative proceeding records

19   go, this is short.

10:22  20             MR. ABRAM:  Compared to the many we have all seen,

21   yes, indeed.

22             THE COURT:  All right.

23             MR. MILASINCIC:  And, Your Honor, to answer the

24   first question, we would say that, no, just looking at that

10:22  25   transcript and converting it to summary judgment would

1    not be the --

2             THE COURT:  Along with everything else that you

3    guys have already presented.

4             MR. MILASINCIC:  Along with the other allegations

10:22   5    that we have already presented.  But even to understand what

6    the arbitrators did or did not consider, to take --

7             THE COURT:  Wouldn't that --

8             MR. MILASINCIC:  -- to assume --

9                     (Simultaneous dialogue)

10:22   10            THE COURT:  -- they're lengthy, thorough -- How

11    many pages was that award?

12            MR. ABRAM:  Was the...?

13            THE COURT:  Award.

14            MR. ABRAM:  Oh.  Sorry, Your Honor.  I think it was

10:23   15    30 or 40 pages.

16            THE COURT:  Again, as awards go in a five-day

17    arbitration, that's pretty long.

18            MR. ABRAM:  It goes to 57 pages including the

19    Protocol Agreement.

10:23   20            THE COURT:  Wipe that out.

21            MR. ABRAM:  But the award itself is 46 pages.

22            THE COURT:  So, let's just say a fulsome and

23    thorough explanation of what they considered and how they

24    got to their results combined with a record of the arguments

10:23   25    and evidence they had, combined with the points that have

1    already been made in the briefing and the additional

2    affidavits that the parties have presented, and I'd give you

3    time to supplement a response to those affidavits.  Maybe

4    depose Mr. Hamilton is the only additional piece.  But then

10:23    5    say, You know what?  The smartest way to do this is on

6    summary judgment -- you guys have essentially argued it that

7    way, frankly -- give you a chance to supplement in the way

8    that I have described, and then I have something that I

9    think is sufficient to decide the critical issue you have

10:24    10    presented.

11           MR. MILASINCIC:  And, Your Honor, we would ask,

12    because it's not going to necessarily be the case that every

13    influence that was exerted -- First of all, we don't know

14    about all of them.  We only know the ones that we have been

10:24    15    able to allege without discovery.  So, we're not going to be

16    able to show --

17           THE COURT:  The question is what the arbitral

18    process consisted of.

19           MR. MILASINCIC:  Well, we'll know with the record.

10:24    20           THE COURT:  If the arbitral process record, which

21    is the transcript, and the award itself are models of their

22    genre, it's going to be tough to do anything.

23           MR. MILASINCIC:  Your Honor, but that's assuming,

24    contrary to our theory and our allegations, that all of the

10:24    25    pressure by ALPA would have been exerted on the record or

1    would have been reflected by some --

2            THE COURT:  But you have already said that you have

3    no basis -- Rule 11 -- to even plead that the arbitrators

4    themselves were tainted.

10:25   5            MR. MILASINCIC:  That's correct.

6            THE COURT:  So, I am struggling to figure out --

7    Now, you're free to argue, obviously, when you file a

8    supplemental brief based on the transcript and perhaps

9    deposing Mr. Hamilton(?) -- is that the --

10:25   10            MR. ABRAM:  Yes, Your Honor.

11            THE COURT:  -- you are certainly free to argue, 'I

12    need more and here's why and here's the 56, I think, (f)

13    standard, 56(f) declaration or affidavit that says here's

14    specifically what I need and why.'  Sure.  I mean you can

10:25   15    make that argument, but you would be doing it in the context

16    of 'Here's what we got and here's why it's not enough.'

17    It's a specific argument as opposed to, 'Well, there might

18    be other stuff out there that we don't know about right

19    now,' but, frankly, you have made some pretty thorough and

10:26   20    specific allegations, and we have an obvious source of

21    information necessary to test the theory of liability that

22    you have alleged.

23            We also have -- as I am conceiving this, that

24    would, I suspect, give us enough to resolve the issue of

10:26   25    estoppel.  But if I decide and if -- I'm not ruling,

1    please -- I haven't seen the stuff -- but, if I were to

2    decide this process is fine, in combination with the award,

3    then I don't even have to get to the Defendants' estoppel

4    argument at all and I think we are, at that point, resolved.

10:27   5          Now, if I do find that the arbitral process

6    was, in fact, undermined, then, frankly, I don't think the

7    estoppel argument matters.

8          MR. ABRAM:  Well, I would want to get to that.  It

9    would depend upon the way in which it had allegedly been

10:27  10   undermined.

11          THE COURT:  Sure.  Fair enough.  Which means we

12    can't get to it until we are there, if you will.

13          MR. ABRAM:  That's a fair point, Your Honor.

14          THE COURT:  So, what I would suggest we do -- and

10:27  15   you guys can tell me if this makes sense or not -- what I

16    would suggest that we do is convert at least the question of

17    the breach of the duty of fair representation and the impact

18    it had on the arbitral process to summary judgment, the

19    motion to dismiss those claims to a motion for summary

10:28  20   judgment and -- because I think the motion you filed was

21    much more limited.

22          MR. ABRAM:  More limited in what sense?

23          THE COURT:  The alternative motion.

24          MR. ABRAM:  Oh.  Yes, it was.  It was strictly with

10:28  25   respect to -- Exactly, Your Honor.

 1          THE COURT:  Right.  Thank you.

 2          MR. ABRAM:  It would take a conversion.  Correct.

 3          THE COURT:  Right.  So, I would convert in order to

 4    permit me to consider easily, without straining any legal

10:28  5    limits, the entirety of the transcript, which I think is

 6    essential to -- and which the parties have essentially

 7    argued to deciding the issue, give you time to submit the

 8    transcript, give you time to depose Mr. Hamilton -- not a

 9    whole lot of time -- and give you some time to supplement

10:29  10    your briefing.  And then, if I need argument at that point,

11    I am happy to give you argument, but, if not, I think I have

12    a good basis on which to rule.

13          MR. MILASINCIC:  And, Your Honor, just to clarify:

14    Would the conversion be limited to solely this prong of the

10:29  15    fiduciary duty claim as to whether it affected the

16    arbitrators in any way?  So, in other words, whether a

17    breach, in fact, occurred --

18          THE COURT:  No.  I think I have got to find a

19    breach, too, but I can find that, I think, in the

10:29  20    information about what was presented --

21          MR. MILASINCIC:  And could we also amend our

22    pleadings, then, Your Honor, to focus more on this third

23    issue of the causation?

24          THE COURT:  In what way would you amend?

10:29  25          MR. MILASINCIC:  To include more specific

1    information about the effect on the arbitrators' decision

2    that's in there now.

3             THE COURT:  I don't have a problem.

4             MR. ABRAM:  If we were having to file the opening

10:30   5    brief, it would help us to know in what respect --

6             THE COURT:  Frankly, if I was to grant the

7    dismissal motion, I would say, fine, you have got leave to

8    amend.  I'd have to do that, too.

9             MR. ABRAM:  They have the whole transcript.  They

10:30   10    can tell us --

11            THE COURT:  No problem.

12            MR. DULMAGE:  Your Honor, I would like to add:

13    Since ALPA is, in fact, saying that Continental MEC, which

14    was the subdivision of ALPA that had to respond to the

10:30   15    Continental pilots -- we almost have to show that they did

16    nothing wrong.  We may be able to find some evidence or

17    introduce some evidence in additional pleadings where that,

18    in fact, happened and we'd like an opportunity to do that if

19    that's their argument.  We didn't anticipate that until we

10:30   20    got into this phase of briefing.

21            THE COURT:  Well, that's the estoppel issue.

22            MR. DULMAGE:  Well, it is, but it isn't, because I

23    think -- See, Continental MEC is gone.  It's now just United

24    MEC.

10:30   25            THE COURT:  It's called "merger".  Right?

1          MR. DULMAGE:  A lot of those same guys went there.

2     So, you can sort of see the political pressure of the wink,

3     wink, nod, nod stuff that may or may not have gone on.

4               We may have some evidence out there with other

10:30  5     pilots that we can introduce into the record and at least

6     plead some things, but we would only do that in good faith

7     without the Court feeling like we were trying to maybe

8     back-door the case based on --

9          MR. ABRAM:  Your Honor, I have been around enough

10:31 10     to know, when there is a motion to dismiss and the other

11     side wants leave to amend, you're going to grant it.

12          THE COURT:  I am going to grant it at least once,

13     maybe twice --

14          MR. ABRAM:  Maybe.

10:31 15          THE COURT:  -- probably not three times.

16          MR. DULMAGE:  Fair enough, Your Honor.  Thank you.

17          MR. MILASINCIC:  And, Your Honor, is there a

18     protocol you would suggest?  Because, as I am thinking about

19     this, there are many types of limited discovery --

10:31 20          THE COURT:  I am going to set some dates and I am

21     going to set some limits on discovery.  If you want to go

22     beyond that, let's come back and talk about it.  Because I

23     really don't want to do --

24                    (Simultaneous dialogue)

10:31 25          MR. MILASINCIC:  -- limited discovery and they

 1  disagree, then we can --

 2       THE COURT:  Sure.  But try to work it out first.

 3  In fact, what I would suggest is that before you file a

 4  motion for limited discovery you file -- not file -- you

 10:31  5  send an e-mail or talk on the phone about possible discovery

 6  that would be consistent with perhaps an expansive view of

 7  what the Court has in mind, which is to essentially stage

 8  the case and limit the discovery at this stage to this

 9  threshold issue which I think is critical to going forward.

 10:32  10       So, that's what we're doing.  We're narrowing,

 11  staging and limiting discovery -- or "targeting" discovery,

 12  is the better word -- to what is necessary to resolve fully

 13  and accurately the threshold issue.

 14       MR. ABRAM:  Of the impact on the arbitration

 10:32  15  process?

 16       THE COURT:  Correct.

 17       MR. ABRAM:  Thank you.

 18       THE COURT:  Of what ALPA did.  And that's why I

 19  don't really need to -- You can argue that what they did was

 10:32  20  or wasn't in breach of their duty -- that is, that it was

 21  not arbitrary or it was arbitrary, it was not in bad faith,

 22  it was in bad faith, it was indiscriminatory or it wasn't.

 23  And, there, I suspect, you have got stronger -- If by

 24  "discriminatory" you mean "not neutral" -- I think that's

 10:33  25  the crux of your argument, a combination of bad faith and

1    not neutral.

2            MR. MILASINCIC:  Correct.

3            THE COURT:  Right.  So --

4            MR. MILASINCIC:  And for purposes of this limited

10:33   5    summary judgment, would our allegations of the bad faith

6    acts be treated as true or would we need to also prove those

7    up through this limited discovery?

8            THE COURT:  So, what kind of allegations -- You

9    know, the Hamilton deposition is directed, in part, towards

10:33  10    that.

11            MR. MILASINCIC:  And I'll have to check whether it

12    would actually be Mr. Hamilton.  I believe he was primarily

13    offered on this administrative exhaustion issue.  I'd have

14    to review that.

10:33  15            MR. ABRAM:  He was offered, I believe, on the

16    witness --

17            THE COURT:  Payments.

18            MR. ABRAM:  -- payment.

19            THE COURT:  Right.  And that's the key.  That's

10:33  20    where I thought you were going here.  Yeah.

21            So, I don't know what else you intend to add

22    by way of amendment, but I think we are relatively clear

23    that this is targeted towards the threshold issue.

24            On the question you asked, is it going to be

10:34  25    assumed as true -- well, to the extent we're converting to

1    summary judgment, it's not assumed as true, but all

2    inferences are going to be taken in your favor and all the

3    usual presumptions that apply on a Rule 56 motion would

4    apply.

10:34    5        MR. ABRAM:  We would not be, Your Honor -- just to

6    be clear in filing our next brief on the motion for summary

7    judgment, we wouldn't be trying to put in a series of

8    declarations about these various others acts.

9        THE COURT:  No.  That's right.

10:34    10        MR. ABRAM:  And we would not do that without

11    waiving the ability to do that at some point.

12        THE COURT:  I agree.  Here's where I think we are.

13            What ALPA did in the arbitration is not in

14    factual dispute.  Okay?  It's going to be on the record.

10:34    15    There may be some things that aren't.  The payments.  We're

16    going to have the deposition relevant to that.  The merger

17    agreement that was the backdrop, the Merger Policy that

18    forms the backdrop.  But most of what ALPA did -- the

19    positions it took, the briefs it filed, the arguments it

10:35    20    made, the evidence it presented -- in the arbitration are

21    going to be on the record of that arbitration.

22        MR. MILASINCIC:  Except for and one thing we would

23    ask for in this limited discovery is any communications, and

24    maybe the answer is none to this RFP that ALPA or its

10:35    25    employees and officers had with these arbitrators about this

seniority list off the record.  And perhaps their answer to

that, in requests for production, will be 'We did a good

faith search and there aren't any,' but we would at least

like to --

10:35   THE COURT:  Why don't you find that out.

MR. ABRAM:  We'll be glad to find that out, Your

Honor, although it's contradicted by their recognition that

these arbitrators were not corrupted.  But, nonetheless, we

understand and you're asking us to do that and we will.

10:36   THE COURT:  I think that's appropriate to do.

MR. ABRAM:  Thank you, Your Honor.

THE COURT:  I think you can do it without the need

for a formal discovery request.  There's one been made on

the record here in court.

10:36   MR. ABRAM:  Thank you, Your Honor.

MR. DULMAGE:  I'm not so sure we're conceding just

yet that there wasn't some corruption in the process.  We

just don't have any evidence --

THE COURT:  I heard you say that earlier, but --

10:36   That's fine.  That's fine.  You don't have any Rule 11 basis

to go forward with making any allegation about it.

MR. DULMAGE:  And if I could take 20 seconds and

give the Court an example.  I had in Judge Ewing's court

against the local --

10:36   THE COURT:  You mean Judge Werlein?

 1          MR. DULMAGE:  Yeah.  Werlein.

 2          THE COURT:  Thank you.

 3          MR. DULMAGE:  Excuse me.

 4          THE COURT:  Just don't call me "Judge Lee".

10:36  5          MR. DULMAGE:  Yeah.

 6              Years ago we had an arbitrator that had an

 7      opinion giving this guy his job back, and then ALPA, working

 8      with the company, wanted to get the guy out.  So, they

 9      submitted a second award, and we got both of those in

10:36  10      discovery.  And I threatened to sue the arbitrator, and the

11      arbitrator immediately went back to his original award,

12      which was to give the guy his job back.  This stuff

13      sometimes doesn't come up until we get in discovery.

14          THE COURT:  You know, now we're back in the "Weird

10:37  15      things could happen" realm --

16          MR. DULMAGE:  Right.

17          THE COURT:  -- but Rule 11 is a little bit short of

18      that.

19              You don't have any basis that would satisfy

10:37  20      Rule 11 to allege that these guys had been personally

21      corrupted.

22          MR. MILASINCIC:  Right.  And one thing we'll

23      address in our supplemental briefs, Your Honor, is it's not

24      necessary for us to prove anything close to that in order to

10:37  25      prevail on the claim as we've pleaded.

1           THE COURT:  And that's why the focus ought to be on

2    let's look at what ALPA did that is on the record that the

3    arbitrators had and what the arbitrators -- and what the

4    process that the arbitrators used was.  And that's the

10:37  5    focus.  Okay?

6           MR. MILASINCIC:  Thank you, Your Honor.

7           THE COURT:  So, let's set, briefly -- I think our

8    last point here is time to do all of this.

9           MR. ABRAM:  Yes, Your Honor.

10:37  10          THE COURT:  So, the first step is get the

11   transcript.  Has it already been transcribed?

12          MR. ABRAM:  Yes, it has.

13          THE COURT:  So, that's like a matter of days.

14          MR. ABRAM:  They already have it.

10:38  15          THE COURT:  So, file it.

16          MR. ABRAM:  You would like that filed per se as --

17          THE COURT:  It can be filed -- It would be similar,

18   if you will, in the way we handle cases that come in on

19   various kinds of administrative records.  So, you're going

10:38  20   to file the administrative record, if you will.

21          MR. ABRAM:  We will do that, Your Honor.

22          THE COURT:  Just to make things efficient for me,

23   file it with the decision, with the award.

24          MR. ABRAM:  And the exhibits.  And, Your Honor,

10:38  25   it's a full record, and some of this is confidential and, if

1    it is, we will file separately anything that was

2    confidential, because, you know, some is company

3    confidential information that we can't disclose.

4            THE COURT:  Okay.  Yeah.  Well, you can if I order

10:38  5    you to, but we're going to have to get there.

6            MR. ABRAM:  Well, we will do it as part of a

7    separate filing, but it's confidential.

8            THE COURT:  That's fine.

9                  So, what I would appreciate -- because I

10:38  10   expect it's going to be somewhat voluminous, not huge,

11   but -- So, file it electronically, but also send a courtesy

12   copy -- two courtesy copies -- one for the law clerk -- to

13   chambers.

14           MR. ABRAM:  And that would be printed form?

10:39  15           THE COURT:  The old-fashioned way.

16           MR. ABRAM:  You got it, Your Honor.

17           THE COURT:  You can double-side it.

18           MR. ABRAM:  We'll save a few trees.

19           THE COURT:  There you go.

10:39  20                  So, do that, if you will.  I know it's summer.

21   Can you do both of those things by -- is August 15th too

22   short?  That's two weeks from tomorrow.

23           MR. SOUTHERLAND:  No.

24           THE COURT:  Somebody going on vacation?

10:39  25           MR. SOUTHERLAND:  I think we can get it filed.

         1              MR. ABRAM:  I am, but it doesn't matter.  It will
         2   be just shortly before then.
         3              MR. SOUTHERLAND:  We'll get it done by then.
         4              THE COURT:  All right.  So, file that by August 15.
10:40    5              Now, what's a reasonable amount of time, since
         6   you both have access to it now and you're not waiting for it
         7   to be filed to have access to it, either side -- what's a
         8   reasonable amount of time for a supplemental -- well, to
         9   complete additional discovery (limited) -- limited,
10:40   10   limited -- on the points that will be considered in this
        11   threshold summary judgment?
        12              MR. MILASINCIC:  I would suggest three months, Your
        13   Honor.
        14              THE COURT:  Oh, no.  No.  No.  No.
10:40   15              MR. MILASINCIC:  And if I may.  The only reason for
        16   that is because many of these witnesses, being airline
        17   pilots and the Union being in DC --
        18              THE COURT:  But there are not that many witnesses.
        19              MR. MILASINCIC:  There will be one or two and the
10:40   20   document requests.  Perhaps two months.
        21              THE COURT:  60 days I am comfy with.  I'm not
        22   comfortable with 90 days or beyond.
        23              So, 60 days, which will take us to, let's say,
        24   September 26 any additional discovery will be completed.
10:41   25              Supplemental brief.  Of course, you will be

1    briefing busily before then because you will be dealing with

2    the transcript, which you already have.  So, I am thinking

3    that we could do the supplemental brief pretty quickly after

4    the last discovery is completed, which does not have to wait

5    until the very end of September.  Could you get that done by

6    October 13th?

7              MR. ABRAM:  Yes, Your Honor.

8              THE COURT:  Is that reasonable?

9              MR. ABRAM:  This would be ALPA's -- ALPA is doing

10   the next brief?

11             THE COURT:  Yes.  I think so.

12             MR. ABRAM:  Yes, Your Honor.

13             THE COURT:  I think so.  And what I would do,

14   again, just to have it all in one place, is just file it as

15   if it was your brief, not incorporating by reference

16   everything that went before and 'We're now going to add a

17   few things.'  Just file a brief on this issue, on this

18   motion.  And if it repeats some of what you said earlier,

19   great; it's all in one document.

20             MR. ABRAM:  Makes sense.  Thank you, Your Honor.

21             THE COURT:  And you will have then the usual period

22   after that, which would be November 3rd.  I am going to give

23   you until November 10th to file a brief reply.

24                  And I don't think we're going to need argument

25   because I think we have had a lot of it, but I am happy to

1    schedule it, which would be -- Let's schedule it for

2    November 17, just shortly after the reply.  Okay?

3             MR. MILASINCIC:  And, Your Honor, may we have until

4    the discovery deadline to amend the pleadings or is there a

10:42    5    different date you would have in mind?

6             THE COURT:  Let's do it a little bit earlier than

7    that -- let's say two weeks before -- so that, if there is

8    any additional discovery that needs to be done based on what

9    you asserted -- Well, we ought to do it 30 days before.

10:43   10    Yeah, I think we ought to do it 30 days before.  So, amend

11    your pleadings by August 29.

12             MR. MILASINCIC:  Yes, Your Honor.

13             THE COURT:  So, having said all of this, I am going

14    to deny the motion to dismiss as moot because  a) you're

10:43   15    going to amend and  b) I am converting.

16             I am going to deny, at this point on the

17    present record, the motion to require the joinder of United.

18    Clearly, for this threshold stage, it is not necessary.  And

19    I am quite worried about the propriety of doing that, given

10:44   20    the absence of case support, that I could find that the

21    employer is an appropriate, compelled added party in a "duty

22    of fair representation/breach" case between the Union and

23    members of the Union; and that's really what we're talking

24    about, in the absence of any indication by United that it

10:44   25    wants to come to this party.

1          MR. ABRAM:  Subject to later possible revisit.

2          THE COURT:  I have denied it based on the present

3     record.  That's all I have done.

4          MR. ABRAM:  Your Honor, regarding November 17 --

10:44   5          THE COURT:  Yes, sir.

6          MR. ABRAM:  -- I am hoping that this does not

7     occur, but I am currently scheduled for a trial in Denver.

8          THE COURT:  If you are, indeed, in trial and you

9     know within a reasonable period before then, let us know and

10:45  10     we'll move it, but let's go ahead and keep it on that date

11     for now, because we all know that a lot can happen to a

12     trial that is set in November.

13          MR. ABRAM:  Yeah.  Thank you, Your Honor.

14          THE COURT:  We're on the calendar, at least.  And I

10:45  15     may decide I don't even need to see you based on what I read

16     and have available here for me.

17               Is anybody going to get this transcript?

18          MR. ABRAM:  Yes, Your Honor.

19          THE COURT:  Okay.  Would you make sure you file a

10:45  20     copy as well, then, just so we have it on the record.  All

21     right?

22          MR. ABRAM:  We will do that.

23          THE COURT:  Good.  Anything further for today?  Are

24     there any other outstanding motions that I can helpfully

10:45  25     address today?

1          MR. MILASINCIC:  There are not, Your Honor.

2          MR. ABRAM:  No, Your Honor.

3          THE COURT:  Thank you very much.

4          MR. ABRAM:  Thank you, Your Honor.

10:45   5          MR. MILASINCIC:  Thank you, Your Honor.

6

7                    COURT REPORTER'S CERTIFICATE

8          I, BRUCE SLAVIN, certify that the foregoing is a

9   correct transcript from the record of proceedings in the

10   above-entitled matter, to the best of my ability.

11

12                              *s/Bruce Slavin*
                              BRUCE SLAVIN, RPR, CMR
13

14

15

16

17

18

19

20

21

22

23

24

25