United States District Court
Southern District of Texas

**ENTERED**

July 29, 2016

David J. Bradley, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| MICHAEL CARR, *and others similarly situated*, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | CIVIL ACTION NO. H-14-0451 |
| AIRLINE PILOTS ASSOCIATION, INTERNATIONAL, | § § § | |
| Defendant. | § § | |

**MEMORANDUM AND OPINION**

This case illustrates some of the challenges presented when airlines merge and the seniority lists of their pilots must be integrated. Michael Carr was a Continental Airlines pilot when it merged with United Air Lines to form United Airlines.[1] Carr and similarly situated former Continental pilots have become United Airlines pilots since the merger. A new integrated seniority list had to be generated, a process that predictably produced disputes. As the Seventh Circuit recently noted in an opinion addressing similar issues arising from the same merger, "any improvement in the position of one carrier's pilots meant a relative demotion for pilots coming from the other carrier." *Cunningham v. Air Line Pilots Association, Int'l*, 769 F.3d 539, 540 (7th Cir. 2014).

In *Cunningham*, as here, a single union, the Air Line Pilots Association, commonly known as ALPA, had represented both the United and Continental pilots and owed a duty of fair representation to both in the postmerger list integration. Carr sued ALPA on his own behalf and for

---

[1] For convenience, this opinion refers to the former Continental Airlines as "Continental" and the former United Air Lines as "United."

other similarly situated pilots, claiming that ALPA had breached the duty it owed to the former

Continental pilots by interfering in various ways with the arbitration properly invoked to resolve the

disputed issues on how to integrate the seniority lists.  ALPA moved for summary judgment, arguing

that it did not breach any duty owed.  (Docket Entry No. 50).  Carr responded and moved to strike

some of the evidence ALPA submitted, and ALPA replied.  (Docket Entries No. 54, 55, 61, 63, 67,

68).

Both cases illustrate the "need for compromise."  *Id.*  The compromises have not breached

ALPA's duty of fair representation.  Here, as the court observed in *Cunningham*, "[c]ombining work

forces following an airline merger is not for the faint-hearted.  The Union and United worked out

a series of deals, large and small, that have enabled two groups of pilots to work as one without

undue friction.  That's a significant accomplishment, not a source of legal liability."  *Cunningham*,

769 F.3d at 542-43.

Based on the motions, responses, and replies; the record; the law; and the arguments of

counsel, the court denies Carr's motion to strike and grants ALPA's motion for summary judgment.

Final judgment is separately entered.  The reasons are explained in detail below.

## I.    Background

In 2010, United Air Lines and Continental Airlines announced their merger to form United

Airlines.  Work began on producing unified rosters for the pilots, including integrated seniority

lists.[2]

ALPA represented all the pilots—the United pilots, the Continental pilots, and the merged

---

[2]

The McCaskill-Bond Amendment to the Federal Aviation Act, Pub. L. 110-161, Div. K, Title I, § 117, Dec. 26, 2007, 121 Stat. 2382, 49 U.S.C. § 42112, note, requires merging air carriers to integrate employee seniority lists under the policies of the unions that represent the same groups of employees at both carriers.  That union is ALPA.

carrier pilots.  ALPA represented each pilot group through its Master Executive Council, made up of members that each airline's pilots elected.  The Council members in turn elected the Council's officers.  (Docket Entry No. 50, Declaration of Bruce A. York, ALPA's Director of Representation, who ALPA assigned to coordinate the arbitration on its behalf, at ¶ 2).

ALPA had established a merger policy, with the input of pilots from both United and Continental, long before those carriers merged.  (Docket Entry No. 61, Couette Decl. at ¶¶ 2-3).  The merger policy required ALPA to "provide the process" to integrate merging carriers' pilot-seniority lists.  (*Id.*, York Decl., Ex. A (Merger Policy) at 4).  The process was to be applied by Merger Committees, or Merger Representatives, representing each affected pilot group.  For each merger, each pilot group's Master Executive Council would select its Merger Committee members.  (*Id.*, York Decl. at  ¶¶ 2, 5).  United and Continental each selected a Merger Committee to represent its pilots in the seniority-integration process.

ALPA's merger policy specified the procedures for integrating the pilot seniority lists.  The merged pilot groups would first try to agree on integrating the lists.  If the parties could not agree, they were to submit the disputed list-integration issues to binding arbitration.  (*Id.* at 14-16).  The merger policy required the Merger Committees and the arbitrators to consider certain factors in making the integrated list, but assigned the factors no preset weight or order of importance.  The factors  include each pilot group's career expectations, status and category,[3] and longevity.  (*Id.*, York Decl., Ex. A (Merger Policy) at 14).

ALPA's merger policy gave the Merger Committees "complete and full authority" to

---

[3]

"Status" refers to rank, such as captain or first officer.  "Category" refers to the type of aircraft a pilot flies.  Examples are "B737 Captain," or "A320 First Officer."  (Docket Entry No. 61 at 8).

negotiate and, if necessary, arbitrate a "fair and equitable" and "final and binding" integrated seniority list. (*Id.*, York Decl., Ex. A at 11, 15, 18).  The parties agree that the ALPA merger policy permitted the Merger Committees and the Master Executive Councils to "fashion their own process" or protocols for resolving the disputed issues if they met certain "fundamental requirements."  (*Id.* at 3).

Continental and United agreed through their Master Executive Councils and Merger Committees to follow a protocol for integrating the seniority lists.  That protocol is set out in the Transition and Process Agreement that the United and Continental Master Executive Councils, ALPA, and the merged airlines signed.  (*Id.*, York Decl., Ex. B (Transition and Process Agreement)).  The Master Executive Council for each pilot group elected its own Merger Committee, which in turn retained its own counsel.  The protocol called for arbitrators to be selected from "an ALPA-maintained list of professional labor arbitrators, using the alternate-strike method if necessary."  (Docket Entry No. 50, York Decl. at ¶ 8 and Ex. B, Att. B at 4).

The United and Continental pilot groups held informal discussions on integrating the lists, but they could not agree.  They proceeded to arbitration as called for by the merger policy and the Transition and Process Agreement.  (*Id.*, York Decl. at ¶ 7).  The Merger Committees consulted their separate counsel and selected three arbitrators from the ALPA-maintained list.   The arbitrators—Dana E. Eischen, Roger P. Kaplan, and Dennis R. Nolan—drew no objections.  Under the ALPA merger policy and the parties' protocol, the arbitrators had the "final authority to establish . . . procedural and evidentiary rules as deemed appropriate."  (*Id.*, York Decl., Ex. A at 17 and Ex. B, Att. B at 5).

ALPA's merger policy prohibited it from paying "legal and consulting fees" for either pilot

group.  (*Id.*, York Decl., Ex. A at 22).  Each group had to pay these fees through its Master Executive Council's Merger Assessment Fund.  (*Id.*).  At the same time, ALPA's merger policy, codified in § 45 of ALPA's administrative manual, allowed a Merger Committee to retain consultants of its choice.  Yet another portion of the administrative manual provided that ALPA could not retain a consultant who was an active pilot for an airline whose pilots ALPA represented. (Docket Entry No. 50, Couette Decl., Ex. A at 73).  The parties dispute what limits the merger policy and the administrative manual imposed and whether ALPA violated them.

During the prehearing discovery, the parties disputed whether the Continental pilots could discover the individual United pilots' salary-payment records.  The ALPA merger policy and the parties' Transition and Process Agreement required ALPA to obtain discoverable records from the merging carriers and provide them to the pilot groups in the arbitration.  (Docket Entry No. 50, York Decl. Ex. A and B).  The discovery dispute concerned the Continental pilot group's request to obtain the United pilots' individual W-2 forms and whether ALPA could obtain that information from the United pilots to produce to the Continental pilot group in the arbitration.  The Continental pilot group argued that individual pilots' W-2 forms were relevant to show that United pilots had earned less than Continental pilots flying the same-sized aircraft.  The Continental pilot group argued that this information was relevant to the integration factor of career expectations.  (*Id.,* York Decl. at ¶ 10).

The United pilot group objected that disclosing individual pilots' W-2 was not necessary and violated their privacy.  (*Id.*).  The parties had agreed in the Transition Process Agreement that Joshua Javits, an arbitrator who was not involved in the list-integration decision, would decide discovery disputes.  (*Id.* at ¶ 9).  ALPA sent one of its attorneys, Betty Ginsburg, to the hearing

Javits held on this discovery dispute.  (Docket Entry No. 54, App'x. A, Tab 1 (Ginsburg Depo.) at 10:18-11:18).  Ginsburg was an ALPA attorney regularly assigned to help United pilots with their union business.  (*Id.* at 8:21-9:2).  Ginsburg stated on the record at the arbitration hearing that she was present, but she made no other statements.  (Docket Entry No. 50, Winston Aff., Ex. D (Ginsburg Depo) at 13:25-14:9).

Javits and Ginsburg talked outside the hearing room during a break.  Ginsburg later testified that they did not discuss the merits of the case or the discovery dispute.  (*Id.* at 22:2-23:25).  Carr disputes her credibility and alleges that Javits and Ginsburg did discuss the discovery dispute.  Carr argues that Javits had previously indicated his inclination to rule for the Continental pilot group by denying the United pilot group's objection, but he instead granted the United pilot group's objection.  Carr asserts that Javits's change in position supports the inference that talking to Ginsburg influenced him.

The record shows that Javits granted the United pilot group's objection, but only in part.  Javits ordered the production of United pilots' wage information, but he limited it by allowing United to redact the United pilots' names and seniority numbers, an easy identifier, to protect their privacy.  (Docket Entry No. 50, York Decl., Ex. F (Javits Award) at 22-25).  Javits also ordered that each pilot's seniority date be placed within a six-month range to give the Continental pilot group the information relevant to the integration factors.  (*Id.*).

A separate discovery dispute arose after this ruling.  The United pilot group sought information on when each Continental pilot had entered a defined-benefit plan.  The United pilot group argued that this information was relevant to the integration factor of longevity for those pilots who joined Continental after it merged with a regional affiliated carrier.  Continental pilots coming

6

from a regional affiliate were given priority positions on the Continental seniority list regardless of their time as Continental pilots.  The United pilot group argued that the dates the Continental pilots entered a defined-benefit plan best indicated their actual longevity.  The Continental pilot group objected that the production request intruded on the Continental pilots' privacy, the same ground the United pilot group had asserted in opposing Continental's request to produce individual pilots' W-2 forms.

ALPA did not send a representative to the hearing on the production of the defined-benefit plan documents.  ALPA explains that documents showing when individual pilots joined a defined-benefit plan did not raise the same privacy concerns as the individual pilots' W-2 forms.  (Docket Entry No. 54, App'x A, Tab 6 (York Depo.) at 47:12-24; 48:16-50:20).  The requested production of defined-benefits information did not, for example, seek specific earnings amounts for individual pilots.  (*Id.* at 47:12-24; 59:7-20).

Javits granted the United pilot group's discovery request, overruling the Continental pilot group's objection.  (Docket Entry No. 54, App'x G, Tab 4 (Javits Award II)).  Although Javits did not restrict the response or require redactions, he noted that the United pilot group had agreed to steps protecting the confidentiality of the information.  These steps included restricting the information to the United Merger Committee and its counsel and requiring any discussion of the information in the arbitration hearing to occur only in closed sessions.  (*Id.* at 7).

The arbitration panel held 16 days of hearings between April and June 2013. (Docket Entry No. 50, York Decl. at ¶ 7).  The Master Executive Councils and Merger Committees of each pilot group were represented by their chosen counsel throughout.  Both sides submitted extensive direct testimony, expert-witness reports and live testimony, and many documents.  Both sides were

allowed ample cross-examination of the opposing side's witnesses. Both sides presented proposals for integrating the lists and pre- and posthearing briefs. Neither pilot group challenged the arbitrators or the process or procedure they used until after the award issued on September 3, 2013.

Dr. Brian Campbell testified as an industry expert for Continental. In support of the list-integration factor of career expectations, Dr. Campbell testified that Continental was in a superior financial position pre-merger and that Continental pilots had earned more than United pilots. United countered Dr. Campbell's testimony with the testimony of industry experts Morris Garfinkle and Dan Akins. Mr. Garfinkle conceded that United had recently posted losses, but he argued that economic pressures meant that neither airline had the option of remaining independent. Mr. Akins testified that United had a stronger global franchise than Continental and disputed that United pilots earned less than Continental pilots. Several Continental pilots testified for Continental, including Captain James Brucia, the Chairman of the Continental Merger Committee.

One of the witnesses testifying in the arbitration for the United pilot group was Captain James Harwood, a Delta Airlines pilot. Delta pilots are among those ALPA represents. (Docket Entry No. 54, App'x A, Tab 4 (Harwood Depo), Ex. 2 at 3). Captain Harwood's testimony included his views on how the arbitrators could meet their obligation to consider pilots' longevity as a factor in the seniority-list order and also take into account their service for other carriers that either United or Continental had acquired through mergers or acquisitions. This was particularly problematic for the Continental pilots, many of whom had become Continental pilots when Continental acquired the regional airlines they worked for. The problem was how to consider their pre-Continental service as part of accumulated longevity when other pilots would show more Continental years of service on a Continental-only list. (Docket Entry No. 54, App'x G, Tab 2 (Harwood testimony) at 2350:17-

2351:20).

Captain Harwood testified that the arbitrators could follow the method used in creating other integrated-seniority lists. That method assumed that a pilot's seniority ranking corresponds to his or her longevity ranking, so that the highest-ranked pilot on the seniority list had the most longevity, the next ranked pilot had the next-greatest longevity, and on down the list. Captain Harwood testified that this method maintained the seniority of individuals within each group but also gave full value to longevity. (Docket Entry No. 54, App'x G, Tab 2 (Harwood testimony) at 2374-81, 2386-89, 2390-98).

The final step, according to Captain Harwood, was to blend the status-and-category list with the longevity list. The result would then be integrated with a "similarly blended list" for the other pilot group. That would "create a weighted average between the two" groups. (Docket Entry No. 61, Defendant's Brief at 9; 54, App'x G, Tab 2 (Harwood testimony) at 2402).

The Continental pilot group presented a competing proposal on how to apply the merger policy requirement to consider the enumerated factors in deciding how to create the integrated seniority list. Captain Brucia explained the rationale for Continental's model for seniority-list integration. (Docket Entry No. 50, York Decl., Ex. C. (Award) at 12). The model grouped captains and first officers separately, but did not directly incorporate longevity. The model instead used a pilot's status as a captain or first officer as a proxy for longevity. (*Id.* at 12). Captain Brucia and other Continental pilots also testified that United was overstaffed and Continental's proposed model discounted furloughed United pilots. The United pilots disputed pilot overstaffing and emphasized the superior size of the aircraft in United's fleet, arguing that United's larger planes made it more competitive internationally.

9

The arbitrators found that the "[United] hybrid proposal" was "conceptually truer to ALPA merger policy than the [Continental] proposal."  (Docket Entry No. 50, York Decl., Ex. C at 34). The panel concluded that "using a hybrid methodology that combines elements of both the Date-of-Hire and Status/Category ratio models can reduce aggregate equity distortion.  The fairly straightforward combination of those two most commonly used methods in the [United] model was a good conceptual base for building our [integrated-seniority list]."  (*Id.*).  By contrast, the Continental Merger Committee's methodology and the integrated seniority list it produced were "incompatible with the revised ALPA Merger Policy.  Aside from the windfall inequities generated by using an April 1, 2013 snapshot date, total disregard of the longevity factor cannot possibly be justified in the factual circumstances of this case."  (*Id.* at 22).  The panel found that the Continental pilot group's integrated list was produced by "fatally defective methodology" and was "neither fair nor equitable."  (*Id.*).

After the hearings ended, Captain Harwood worked as a member of the arbitration panel's technical-assistance team, made up of technical experts designated by both Merger Committees to help the panel members get the data and analysis they needed to generate the integrated seniority list.  Captain Harwood's testimony, his involvement after the arbitration hearings, and the compensation he received, are a major basis for the Continental pilot group's claim that ALPA violated the duty of fair representation by allowing Captain Harwood to participate and by retaining or paying him.

One issue is whether the United pilot group's retention of Captain Harwood, and ALPA's failure to prevent that retention, violated ALPA rules.  Section 60 of ALPA's administrative manual contains rules governing ALPA's accounting and finance practices.  One of these accounting and

finance rules, § 60.D.6, prohibits a Master Executive Council from hiring "active member pilots" as consultants. Carr argues that this rule prohibited Captain Harwood from participating in the list-integration arbitration. ALPA's Vice-President of Administration, William Couette, testified that other sections of the administrative manual, which also codified the ALPA merger policy, permitted Captain Harwood to participate. In this litigation, Couette points to § 45 of ALPA's administrative manual, which allows a Merger Committee to hire and pay consultants of its choice. Couette interprets § 45 as independent of § 60.D.6 and as permitting the United pilot group's Merger Committee to retain Captain Harwood. (Docket Entry No. 61 at 12; Couette Decl. at ¶¶ 6-7 and Ex. A).

The parties also dispute whether ALPA affirmatively authorized Captain Harwood's involvement in the arbitration on the United pilot group's behalf, or whether ALPA was asked only whether Captain Harwood's involvement created "political issues" because he was an active Delta pilot. ALPA asserts that Captain Harwood asked its president only whether the United pilot group's retention presented a problem because Captain Harwood was a Delta pilot. (Docket Entry No. 61, Second Winston Decl., Ex. N; (Harwood Depo.) at 10-12). Carr asserts that ALPA's president was asked to, and did, authorize Captain Harwood to assist the United pilot group in the arbitration, citing the same deposition testimony. Carr also asserts that ALPA obtained Continental's approval of Captain Harwood's participation, but that Continental conditioned its approval on Captain Harwood doing only technical work and on payment by United, not ALPA. (Docket Entry No. 54, Pierce Depo. at 113:5-114:25). ALPA asserts that the record does not show that it violated its fair-representation duty by not forbidding or limiting Captain Harwood's involvement in the arbitration. ALPA denies that it affirmatively authorized United to retain, or that it, as opposed to the United

pilot group's Merger Committee, retained Captain Harwood to work for the United pilot group in the arbitration.

A related question is whether ALPA paid Captain Harwood for his work in the arbitration as Carr contends.  ALPA's payment would be inconsistent with its position that the United Merger Committee retained and paid Captain Harwood.  ALPA contends that United's Merger Assessment Fund paid Captain Harwood, which would support ALPA's position that the United pilot group's Merger Committee retained Captain Harwood.  ALPA's merger policy provides that "ALPA shall not, under any circumstances, pay any legal and consulting fees incurred by pilot groups involved in merger activity between any two ALPA represented carriers."  (Docket Entry No. 50, York Decl., Ex. A at 22).  Carr cites ALPA's LM-2 Form, which was submitted to the Department of Labor, as indicating that ALPA paid Captain Harwood for his work.  (Docket Entry No. 50, Griffith Decl. Decl. Ex. 5).  ALPA denies that it, as opposed to the United pilots' Merger Assessment Fund, paid Captain Harwood for his arbitration work.  (Docket Entry No. 61 at 11; *see also* Docket Entry No. 50, York Decl. Ex. A at Part 3.C.1; Docket Entry No. 61, Second Winston Decl., Ex. N (Harwood Tr.) at 10-11).  ALPA asserts that any documents showing that it paid Captain Harwood at most show duplicate payments erroneously made.  (Docket Entry No. 50., Griffith Decl. at ¶ 6 and Exs. 1, 2).

Another issue is whether the substance of Captain Harwood's testimony was sufficiently supported and whether it "undermined the integrity of the arbitration" and caused an "erroneous outcome."  (Docket Entry No. 61 at 4).

Finally, in response to the claim that ALPA interfered with the arbitration, ALPA asserts and presents summary judgment evidence that it neither participated in the arbitration, nor

communicated with the arbitrators, on any topic relating to the merits.  ALPA asserts that its involvement was limited to providing logistical support, including scheduling where the hearings would be held, arranging hotel rooms, and paying the arbitrators' bills.  (See Docket Entry No. 50, York Decl. at ¶ 8 and Ex. C).

On September 3, 2013, the arbitrators issued a 46-page award that integrated the seniority lists.  (Docket Entry No. 50, York Decl., Ex. C).  In the award, the arbitrators explained how they incorporated each of the factors the ALPA merger policy required them to consider in integrating the lists.  (*Id.*).  Although Carr claims that the list integration was unfavorable to the Continental pilots, he does not allege that the arbitrators failed to consider the required factors in integrating the lists.

After the award issued, the two Master Executive Councils sent a joint letter to the merging pilot groups, confirming the incorporation of the award in the new joint collective-bargaining agreement that would be effective immediately.  The letter stated that the process set out in the protocol the parties had agreed to follow to integrate the lists was "fair and equitable," and that the arbitration award should also be viewed as fair and equitable.

The Continental pilot group's Master Executive Council chair sent the Continental pilots a separate letter.  It stated that while the chair disagreed with the award result, "the truth is that both [Master Executive Councils] did agree on a process that was considered to be fair and equitable, and that process was followed"; that before and during the arbitration hearing, he did not receive any complaints that the process was "flawed"; and that "[o]nly after" the panel issued its award did "some want to question the process."  (Docket Entry No. 50 at 6; York Decl. ¶ 19 and Exh. J; *id.*, Winston Decl., Ex. A (Pierce Depo) at 148-50).  The Continental Merger Committee issued a

13

separate report to the Continental pilot group, stating that it disagreed with the result but found no basis to invalidate the award.  (*Id.*, York Decl. at ¶ 20 and Ex. K at 16; *id.*, Winston Decl., Ex. A (Pierce Depo) at 148-50).

The merged United Airlines implemented the integrated list, incorporating it into the new United Pilots Agreement.  The combined pilot groups have been working under that list for the past three years.

Carr sued in early 2014, alleging that ALPA violated its duty of fair representation in merging the seniority lists.  He asked the court to vacate the arbitration award and order ALPA to start a new integration process.  Carr alleged that ALPA breached its duty of fair representation by acting in bad faith.  Carr alleges that ALPA preferred the United pilot group over the Continental pilot group because it feared that if the United pilots—the much larger group—were  dissatisfied with the seniority list, they would try to displace ALPA as the bargaining representative for the combined pilots group.  This "could deal a massive financial and political loss to ALPA."  (Docket Entry No. 41, Comp. ¶ ¶ 33, 39-44, 54).  Carr cited ALPA's experience in the 2008 U.S. Airways and American West merger, which resulted in the U.S. Airways pilots rejecting ALPA as its union representative, apparently because the smaller American West pilot group received a favorable result in the postmerger seniority-list integration.

Carr alleges in this lawsuit that ALPA acted on its preference for the United pilot group and breached its duty of fair representation by facilitating Captain Harwood's participation in the arbitration, in violation of ALPA rules; by engaging in *ex parte* discussions with arbitrators that influenced the outcome, including how discovery disputes were resolved; and by refusing to

intervene when the United pilot group made improper political arguments during the arbitration.[4]

Each argument and response is analyzed below.

## II.        The Motion to Strike

Carr objected to some of ALPA's summary judgment evidence and moved to strike it.  The

objections are each addressed.

### A.        The York Declaration

ALPA submitted the declaration of Bruce York, the ALPA employee coordinating the

arbitration.  In paragraph 8, York stated:

> No ALPA staff or national officers participated, and, to the best of my knowledge,
> none had contact with the arbitrators during the process regarding the merits of the
> arbitration  .  .  .  .   Also  to  the  best  of  my  knowledge,  the  Continental  Merger
> Representatives did not ask ALPA to say or do anything in response to arguments
> made by the United pilots group during the merger proceedings.

(Docket Entry No. 50, York Decl. at ¶ 8).  Carr objected that because York made these statements

"to the best of [his] knowledge," he lacked personal knowledge and the statements are conclusory.

The challenged statements described what York saw and heard, and what he did not see or

hear.   He personally knows this information.   York was heavily involved in coordinating the

arbitration for ALPA.  He could reasonably be expected to hear about any communications between

people at ALPA with the arbitration panel or about any communications by Continental's Merger

Committee members with ALPA.  His statements are competent summary-judgment evidence, and

Carr's objections are overruled.

In paragraph 15, York stated that the two pilot groups settled their dispute over United's

---

[4]

The amended complaint asserts that ALPA breached the duty by acting arbitrarily, with discriminatory animus, and in bad faith.  (Docket Entry No. 41 at 19).  In their response to ALPA's motion, the plaintiffs advance only a bad faith theory.

requested production of defined-benefits documents before Javits ruled on that issue. (Docket Entry No. 50, York Decl at ¶ 15). Carr objected that York lacked personal knowledge to make the statement, it is conclusory, and it violated the best-evidence rule by describing the terms or effects of a written settlement.

The challenged statement was in York's personal knowledge. He submitted a second declaration stating that he helped draft ALPA's request that United produce the defined-benefits documents, based on the parties' agreement. (Docket Entry No. 61, York Decl. at ¶ 4). The statement was not conclusory because it addressed the specific fact that the parties had agreed to resolve the specific discovery dispute. The statement did not violate the best-evidence rule; York described the fact of the agreement and its timing—before the ruling on the discovery dispute issued—not the terms set out in a document memorializing the settlement. The best-evidence rule does not prevent a competent witness from describing a fact that exists independent of a writing, even if the fact is also evidenced by a writing.

Carr also objects to Exhibit K to York's declaration. Exhibit K is the Continental Master Executive Council's report on the arbitration award and the integrated list that resulted. The report stated that the Council did not believe that ALPA breached the duty of fair representation in the arbitration. Carr argues that the document was not properly authenticated and is hearsay and improper opinion testimony.

York authenticated the report in his declaration. (Docket Entry No. 50, York Decl. at ¶ 20). The document was not hearsay because it is an opposing party statement issued by the Continental representatives after the arbitration, and the document is clearly relevant. The objection is overruled.

16

Carr objects to the declaration of William Couette, an ALPA executive. Couette properly testified about ALPA's interpretation of its own administrative manual and merger policy, specifically, whether they allowed Captain Harwood's participation in the arbitration. Couette could also testify as to his understanding of how ALPA applied the manual and policy. The objection is overruled.

## III.    The Applicable Legal Standards

### A.    Summary Judgment

"Summary judgment is required when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Trent v. Wade*, 776 F.3d 368, 376 (5th Cir. 2015) (quoting FED. R. CIV. P. 56(a)). "A genuine dispute of material fact exists when the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nola Spice Designs, LLC v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)). "The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact.'" *Id.* (quoting *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"Where the non-movant bears the burden of proof at trial, the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Id.* (quotation marks omitted); *see also Celotex*, 477 U.S. at 325. Although the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not

17

need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

"Once the moving party [meets its initial burden], the non-moving party must 'go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.'" *Nola Spice*, 783 F.3d at 536 (quoting *EEOC*, 773 F.3d at 694). The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075). In deciding a summary-judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008); *see also Nola Spice*, 783 F.3d at 536.

### B.     The Duty of Fair Representation

The duty of fair representation requires a union "to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *O'Neill v. ALPA*, 939 F.2d 1199, 1201 (5th Cir. 1991)

(quoting *Vaca v. Sipes*, 386 U.S. 171, 177 (1967)). The fact that a union decided a dispute in a way that favored one group's interests over another is insufficient to show a breach of the duty. *Id.* at 1204. A "breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Id.* at 1201 (quoting *Vaca*, 386 U.S. at 190). ALPA limits its challenge to bad faith.

Bad faith occurs when a union acts with a "motive to harm" a particular group. *Id.* at 1204; *see also Simo v. Union of Needletrades, Sw. Dist. Council*, 322 F.3d 602, 618 (9th Cir. 2003) ("[T]he discrimination and bad faith analyses look to the subjective motivation of the Union officials."). Bad faith is a "demanding standard" that is met only by a "sufficiently egregious" union action. *O'Neill*, 939 F.2d at 1204 (quoting *Alicea v. Suffield Poultry, Inc.*, 902 F.2d 125, 130 (1st Cir. 1990)). Unions have discretion when resolving internal disputes between conflicted groups and their actions are judged by a "wide range of reasonableness." *Id.* (quoting *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338 (1953)). An action breaches the union's duty only if it "seriously undermine[s] the integrity of the arbitral process." *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 567 (1976). Even if a plaintiff shows that the union breached its duty, the plaintiff must also show that the breach "contributed to the erroneous outcome of the contractual proceedings." *Id.* at 568; *Wood v. Int'l Bhd. of Teamsters, Local 406*, 807 F.2d 493, 500 (6th Cir. 1986).

## III. Analysis

A union satisfies its fair representation duty in a postmerger seniority-integration dispute by establishing "a fair *process* for determining seniority" before the dispute arises. *Air Wisconsin Pilots Prot. Comm. v. Sanderson*, 909 F.2d 213, 216 (7th Cir. 1990) (emphasis in original). One example of a fair process is a process to refer disputes about seniority-list integration after airlines

merge to arbitration, under rules that require neutral arbitrators to integrate the seniority lists without intending to favor one pilot group over the other. *Id.* at 216. The duty of fair representation does not require a union to ensure a "fair" result in resolving disputes, including disputes over seniority-list integration. *See O'Neill*, 939 F.2d at 1201.

The process ALPA adopted and implemented met the requirements for fairness. ALPA adopted a merger policy years before this merger occurred and the disputes arose. The merger policy separated ALPA from the responsibility or ability to decide how to integrate the merged airlines' seniority lists. Instead, arbitrators chosen in a manner designed to facilitate neutrality had the exclusive authority to integrate the lists, and the pilot groups and ALPA agreed to be bound by that decision.

The merger policy required the arbitrators to consider the pilots' career expectations, longevity, and status and category in constructing the integrated seniority list. The requirement facilitated a disciplined, objective approach to integrating the seniority lists rather than a subjective "this looks right" approach that could allow subjective preference for one pilot group over the other. The merger policy and the parties' agreement allowed the pilot groups to vary the process as long as it was consistent with the merger policy. With counseled guidance, the pilot groups did so in the protocol they adopted. The merger policy and the parties' protocol gave the arbitrators, not ALPA, the power to control the specifics of the arbitration procedure, including how to rule on discovery disputes and on evidentiary issues. When the Continental and United pilot groups' Merger Committees could not agree on integrating the lists, ALPA implemented these arbitration procedures and processes.

Carr's arguments as to why a breach occurred do not attack core aspects of the integration

process or procedures ALPA and the parties agreed to use.  Carr does not challenge the arbitration process or the procedures used in the arbitration.  Instead, he argues that ALPA interfered improperly in otherwise fair processes and procedures.  But none of the alleged interferences are "sufficiently egregious" to support an inference that they "seriously undermined" the integrity of the arbitration or the list integration that resulted.  A thorough review of the record evidence shows a fair arbitration process, no bad faith on ALPA's part, and no breach of the duty of fair representation it owed.

Carr alleged that ALPA favored United in the arbitration because United was the larger of the two pilot groups.  Carr cited the 2008 merger between U.S. Airways and American West to support an inference of bad faith.  ALPA represented the pilots of both airlines.  As in this case, ALPA facilitated the postmerger seniority-list integration.  After the lists were integrated, U.S. Airways pilots left ALPA's representation because they believed that the American West pilots received unduly favorable positions on the integrated seniority list.  Carr alleges that ALPA preferred United in the list integration out of fear that the United pilots would also end ALPA's role as the merged carriers' pilots' representative if they did not prevail.

Carr argued that ALPA's involvement in Captain Harwood's work in the arbitration showed that ALPA intended to favor United and took action to implement that intent.  Carr argues that Captain Harwood could not have participated in the arbitration as a witness or in the team that provided technical assistance to the panel unless ALPA's president had authorized him to do so.  Carr argued that allowing Captain Harwood to participate violated ALPA's accounting and finance rules.  Carr also argued that some evidence in the record supports an inference that ALPA, not the United Merger Committee, retained Captain Harwood and paid him for at least some of his work.

ALPA responds that the evidence shows that United, not ALPA, retained Captain Harwood; that United could retain him as a consultant and neither the ALPA merger policy nor its accounting and finance rules clearly prohibited that; and that United, not ALPA, paid Captain Harwood for his work.

Carr's argument that allowing Captain Harwood's participation as a United consultant breached ALPA's duty of fair representation because his participation violated ALPA's accounting and finance rules fails as a matter of law. Even if allowing his participation was inconsistent with ALPA's accounting and finance rules, that did not breach ALPA's duty of fair representation when, as here, the process was otherwise fair. *Rakestraw v. United Airlines, Inc.*, 981 F.2d 1524, 1533 (7th Cir. 1992), is instructive. In *Rakestraw*, a regional airline merged with the larger Trans World Airlines. ALPA represented both pilot groups. The pilot groups could not agree on seniority-list integration, and the regional pilots invoked arbitration under ALPA's merger policy. ALPA's president deferred submitting the dispute to arbitration, seeking nonbinding mediation instead. Trans World Airlines then announced that it would not hire any of the regional pilots, and instead would transfer the regional airline's aircraft to Trans World Airlines and staff those planes with existing Trans World Airlines pilots. Faced with this threat, the regional pilots agreed to seniority-list integration on terms that favored the Trans World Airlines pilots. *Rakestraw*, 981 F.2d 1526-27. The regional pilots then sued, alleging that ALPA breached its duty of fair representation by not following its merger policy requirement for arbitration when the pilot groups could not agree.

In the lawsuit, the regional pilots argued that ALPA was afraid that if the much larger Trans World Airlines pilot group was unhappy with the list-integration results, the group would abandon ALPA as its union representative. The regional pilots argued that ALPA improperly caved in to the

Trans World Airlines pilot group's pressure by delaying the arbitration required under the merger policy and instead pursuing nonbinding mediation. *Id.* at 1533. ALPA responded that it sought mediation to prevent contentious litigation between the pilot groups and to reduce the likelihood that Trans World Airline would simply abandon the regional pilots.

The court held that ALPA did not breach its duty of fair representation owed to the regional pilot group. The court noted that although "[a]dhering to [merger] policy insulates the union against a charge . . . [of] violat[ing] the duty of fair representation[,] . . . [i]t does not follow that deviation exposes the union to liability. *Id.* Although ALPA's president violated the merger policy by deferring the arbitration and using nonbinding mediation, his decision was a judgment call not motivated by bad faith. Instead, the record supported his decision as an attempt to protect the regional airlines from the economic pressure Trans World Airlines was able to exert. The court noted that the judgment call may have been wrong, "but a mistake in judgment does not violate the duty of fair representation." *Id.* Because the overall process was fair, the president's violation of ALPA's merger policy did not breach its duty of fair representation. *Id.*

In the present case, ALPA's president's decision to allow United to retain Captain Harwood as a consultant in the arbitration, or at least not to forbid United from retaining Captain Harwood, may have violated ALPA's accounting and finance rules. But the interaction between the merger policy and administrative manual sections containing the accounting and finance rules that prevent a pilot group from retaining an active pilot as a consultant, and the sections that allow a pilot group broad discretion and authority in selecting and retaining consultants, is unclear. And even assuming that ALPA's president's decision violated ALPA's accounting and finance rules, that does not create a factual dispute material to deciding whether bad faith motivated ALPA, or support an inference

that ALPA acted with the intent to disfavor the Continental pilot group.  Here, as in *Rakestraw*, the process was otherwise fair.  Although ALPA did not prevent Captain Harwood's participation, Carr has not presented or pointed to summary-judgment evidence that bad faith motivated that decision or that ALPA intended to disfavor the Continental pilot group to placate the United pilots and keep them in ALPA's client roster.

The uncontroverted evidence shows that ALPA allowed Captain Harwood to participate as a United-retained consultant whose primary role would be providing technical assistance on list integration to the United pilot group and, with other technical-team members selected by Continental and United, to the arbitration panel.  (Docket Entry No. 54, Pierce Depo. at 113:5-114:25).  Carr does not claim, nor does the record show, that Continental objected in the arbitration to Captain Harwood's participation.  The arbitrators could have excluded Captain Harwood from testifying or providing technical assistance to them if they found his participation to be improper.  The arbitrators retained the power to exclude witnesses.   ALPA's failure to prevent Captain Harwood's participation did not "seriously undermine[] the integrity of the arbitral process," which was otherwise fair, and which the neutral arbitrators—not ALPA—controlled, even if the failure violated ALPA's accounting and finance rules.  *See Hines*, 424 U.S. at 567; *see also Air Wisconsin*, 909 F.2d at 216 ("The plaintiffs disagree violently with the result of the arbitration . . . but have not pointed to the procedures they employed—as being unfair").

Carr asserted that Captain Harwood's testimony and posthearing work made him an advocate for integrating the lists to favor United.  But the record does not show that either Captain Harwood's testimony or posthearing technical assistance "advocated" a particular United approach that was otherwise unsupported.  To the contrary, the record shows ample support for the analytical approach

24

Captain Harwood advocated to account for the longevity of the Continental pilots who worked for regional carriers that Continental acquired or merged with.  The arbitrators' award explains the basis for finding that the approach Captain Harwood testified to was superior to the analysis Continental's retained experts offered.  (Docket Entry No. 50, York Decl., Ex. C at 21-23, 34).

ALPA's alleged compensation of Captain Harwood was not in bad faith, for similar reasons. The record does not show that ALPA acted to disfavor the Continental pilot group or that any payment to Captain Harwood harmed the Continental pilot group.  ALPA's merger policy gave both parties sources of funding to retain consultants in the arbitration.  The merger policy allowed both Master Executive Councils to require their members to pay a fee that could be used to pay for legal and consulting fees incurred in list- integration disputes.  (*Id.*, Ex. A at 22).  If the funds were not enough to cover the expenses, the ALPA merger policy allowed the Master Executive Councils to petition ALPA's president for supplemental funding.  (*Id.*).  Carr does not allege, and the record does not show, that ALPA's payment of Captain Harwood put the Continental pilot group at a financial disadvantage in the arbitration.  The Continental pilot group had ample funding to hire its own consultants to counter Captain Harwood's testimony, and it did so.  Even if evidence showed that ALPA paid some of Captain Harwood's expenses, and that the payment violated ALPA rules or was poor judgment, as in *Rakestraw*, the overall process was fair.

The cases Carr cited are distinguishable.  In *Nellis v. Air Line Pilots Ass'n*, 815 F. Supp. 1522 (E.D. Va. 1993), ALPA represented pilots from Eastern Air Lines.  Eastern pilots went on strike and Eastern Air Lines filed for bankruptcy protection.  Eastern's  assets, including  planes, routes, and gate slots, were sold to airlines whose pilots were also represented by ALPA.  The Eastern pilots alleged that  ALPA's "fragmentation" policy required it to negotiate the transfer of

Eastern pilots to the airlines acquiring the Eastern assets and to protect the transferred pilots' seniority. The Eastern pilots alleged that ALPA violated this fragmentation policy and actively blocked the Eastern pilots' transfer to the airlines purchasing Eastern's assets, under pressure from the pilots ALPA represented at the airlines purchasing the assets. The court held that ALPA did violate its duty of fair representation to the Eastern pilots. But the court also stated that had ALPA violated the fragmentation policy, that would establish a breach. *Nellis*, 815 F. Supp. at 1524-28, 1533.

In *Nellis,* unlike the present case, ALPA—not a three-member arbitration panel—was the exclusive authorized decisionmaker. The fragmentation policy at issue in *Nellis* was the key substantive issue in the case. There was a clear basis for holding that had ALPA violated that policy, it would have been acting with the intent to disadvantage one pilot group to benefit the others. *See Rakestraw*, 981 F.2d at 1533; *Air Wisconsin*, 909 F.2d at 216. There was also evidence in *Nellis* that ALPA's alleged deviation from the fragmentation policy resulted from political pressure from certain pilot groups. *See Nellis*, 815 F. Supp. at 1529 (discussing communications between ALPA and representatives of pilot groups in which the representatives urged action that the plaintiffs alleged violated ALPA's fragmentation and merger policies).

In the present case, by contrast, ALPA did not make the substantive and evidentiary decisions presented in the arbitration. Carr challenged specific instances of ALPA alleged interference in an overall fair procedure and process for resolving the disputed issues. Carr did not allege that ALPA interfered in any substantive issue, and the record does not show that ALPA's role affected the outcome or seriously undermined the integrity of the arbitration. *See Rakestraw*, 981 F.2d 1533.

Carr also cited *Humphrey v. Moore*, 375 U.S. 335, 351 (1964), and *Williams v. Romano Bros. Beverage Co.*, 939 F.2d 505, 509 (7th Cir. 1991). Both cases suggested that a union may breach its duty when representing an employee if the union impedes the employee's ability to present evidence. *Humphrey*, 375 U.S. at 350-51; *Williams*, 939 F.2d at 509. The record does not show that Captain Harwood's participation in the arbitration prevented the Continental pilot group from presenting evidence or argument. The Continental pilot group had ample opportunity to cross-examine Captain Harwood and to introduce competing evidence from its own experts.

The communications between ALPA officials and the arbitrators did not breach the duty of fair representation. An *ex parte* communication with an arbitrator does not breach the duty of fair representation unless the communication improperly influenced the arbitrator. *Shait v. The Millennium Broadway Hotel*, No. 00 CIV. 5584 GEL, 2001 WL 536996, at *10 (S.D.N.Y. May 18, 2001); *see also Glass Workers Int'l Union, Local 182B v. Excelsior Foundry Co.*, 56 F.3d 844, 846 (7th Cir. 1995) (refusing to vacate labor arbitration award based on a "harmless" *ex parte* communication); *Int'l Ass'n of Machinists, S. Texas Dist. Lodge No. 37 v. Dynamic Sci.*, Inc., 322 F. Supp. 2d 817, 823 (S.D. Tex. 2004) (refusing to vacate labor arbitration award because the plaintiff had not shown that an *ex parte* communication with arbitrator influenced the outcome); *Hakala v. Deutsche Bank AG*, No. 01 CIV. 3366(MGC), 2004 WL 1057788, at *4 (S.D.N.Y. May 11, 2004) (same). The *ex parte* communication also must "so affect[] the rights of a party that it may be said that he was deprived of a fair hearing." *Dynamic*, 322 F. Supp. 2d at 823 (quoting *Forsythe Int'l, S.A. v. Gibbs Oil Co. of Texas*, 915 F.2d 1017, 1023 (5th Cir. 1990)). None of the *ex parte* communications Carr alleged meet this standard.

• In one email sent during the arbitration hearing, York told Dana Eischen, one of the

arbitrators, that they were likely to be unpopular, stating "we'll soon see all three photos on the wall in the U.S. Post Office." This statement did not indicate a preference for either side in the dispute. It merely noted the intensity of the dispute between the pilot groups. There was also no evidence that this communication influenced the arbitrators to rule more favorably for the United pilot group.

• Eischen also told York in an email, "Will call you when I can to give you a progress report on how things are going." There is no evidence as to whether or when this call took place, whether any conversation was substantive in nature, or that it influenced the arbitrators to favor the United pilot group.

• Two weeks before the award issued, Eischen told York that the panel was on schedule to issue the award and that he had "more later" to say. There is nothing improper about Eischen telling York the panel's expected schedule for issuing the award. As to Eischen's statement that he would tell York "more later," there is again no evidence as to whether or when there was a later conversation, whether it covered any substantive issues, or that it influenced the arbitrators' ruling.

• Two days before the award issued, Eischen told York, "one of these days I'll tell you some stories." Again, there is no evidence as to what followed or that this communication influenced the arbitrators.

Carr cited *Barrington v. Lockheed Martin*, No. 605CV1601ORL19KRS, 2006 WL 66720 (M.D. Fla. Jan. 11, 2006). In that case, a union member represented by her union in a dispute against her employer alleged that the union representative was biased against her and had engaged in *ex parte* communications with the arbitrator. The plaintiff alleged that the union representative

28

had caused the arbitrator to form a negative opinion about her. *Barrington*, 2006 WL 66720 at \*7. The court denied the union's motion to dismiss because the communications, "if true," would have undermined the integrity of the arbitration. *Id*. This case is easily distinguishable. In *Barrington*, the court ruled on a challenged motion to dismiss. In this case, ALPA filed a motion for summary judgment with a voluminous record, giving the court a much more detailed basis for ruling than the allegations in a complaint challenged on a motion to dismiss. Carr did not submit or point to evidence in the summary-judgment record creating a factual dispute material to determining whether there were *ex parte* communications adverse to the Continental pilot group that influenced the arbitrators, or point to evidence supporting an inference that these communications took place. *Dynamic*, 322 F. Supp. 2d at 823.

Nor do the discovery disputes support an inference that ALPA breached a duty owing to the Continental pilot group. Carr did not point to or submit evidence that ALPA failed to set up a fair process for resolving discovery disputes. Javits, not ALPA, had the exclusive authority to resolve the disputes. (Docket Entry No. 50, Ex. B at 14-15). Carr alleged that Javits granted key discovery to the United pilot group but denied the Continental pilot group's similar discovery request. The differences between the discovery sought in each of the two production requests, and the limits on the documents produced to protect individual pilot privacy while allowing each side to obtain needed information, are amply demonstrated in the record. The record undermines Carr's allegations.

Carr argues that sending Ginsburg to the hearing on one discovery dispute but not the other signaled to Javits that ALPA wanted him to resolve both disputes to favor the United pilots group. The record does not support this attenuated series of inferences. *See Wood v. Int'l Bhd. of*

*Teamsters, Local 406*, 807 F.2d 493, 501 (6th Cir. 1986).  ALPA has explained the differences in how it viewed the two disputes and the hearings on each.  There is no evidence that in the hearing she attended, Ginsburg indicated which side of the dispute ALPA favored.  Ginsburg's only statement on the record was her appearance.  Carr alleges that during a break in the hearing, Ginsburg and Javits talked in the hallway.  But there is no evidence that Javits and Ginsburg discussed the merits or that Javits's decision was influenced by anything Ginsburg said.  Javits's decisions were reasoned and explained, and accompanied by steps to provide core information to Continental about the United pilots' compensation while protecting individual-pilot privacy.  Carr has not shown that those discovery rulings undermined the Continental pilot group's ability to present its case at the arbitration.  *See Shait*, 2001 WL 536996, at *10; *Dynamic*, 322 F. Supp. 2d at 823 (S.D. Tex. 2004).

Carr argues that ALPA breached its duty of fair representation when it did not step in to interrupt the United pilot group's closing arguments that allegedly improperly encouraged the arbitrators to consider the political impact of their decision on ALPA.  Carr does not identify, and the court has not found, case authority for the proposition that a union must interject itself in this fashion into an arbitration that has valid processes and procedures in place.  Instead, the case law appears to support the proposition that a union's duty is satisfied by establishing neutral and valid processes and procedures for the arbitration.  *See Air Wisconsin*, 909 F.2d at 216.  ALPA set up a neutral decisionmaking process that required the arbitrators to consider specific factors in merging the lists.  None of the factors is a "political" consideration.

The uncontroverted evidence in the record shows that, as a matter of law, ALPA did not breach its duty of fair representation to the Continental pilot group.  There is no basis to find a

factual dispute material to determining whether ALPA breached its duty or to support an inference that it did so.  ALPA's motion for summary judgment is granted.

**IV.      Conclusion**

Carr's motion to strike, (Docket Entry No. 55), is denied.  ALPA's motion for summary judgment, (Docket Entry No. 50), is granted.  Final judgment is entered by separate order.

SIGNED on July 29, 2016, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

31